## NATIONAL LABOR RELATIONS BOARD
## v. FORD MOTOR CO.

No. 8399.

Circuit Court of Appeals, Sixth Circuit.

Oct. 8, 1940.

As Amended Dec. 5, 1940.

Charles Fahy and Robert B. Watts, both of Washington, D. C. (Charles Fahy, Robert B. Watts, Laurence A. Knapp, and H. G. Ingraham, all of Washington, D. C., on the brief), for petitioner.

Alfred McCormack, of New York City (Frederick H. Wood, Alfred McCormack, and Cravath, de Gersdorff, Swaine & Wood, all of New York City, and Louis J. Colombo, of Detroit, Mich., on the brief), for respondent.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

Upon charges filed with the petitioner's Regional Director at Detroit, by the International Union, United Automobile Workers of America, accusing the respondent of engaging in unfair labor practices as defined and condemned by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., a complaint was issued on June 26, 1937, alleging violations of the provisions of Section 8(1), (2) and (3) of the Act. Following a hearing before a trial examiner, subsequent transfer of the proceedings to the Board, and numerous procedural steps before the Board and here, the order sought to be enforced was issued on August 9, 1939.

To the petition for enforcement the respondent filed answer accompanied by a cross-petition to review and set aside the petitioner's order, pursuant to Section 10(f) of the Act. Collaterally it presented motions for orders to compel the Board to answer the allegations of its cross-petition, to direct the Board to supplement the record, and to file additional parts of the record, together with a petition for a commission to take depositions of various officers and employees of the Board in respect to the practice by which decision was reached. The petition for a commission to take depositions was denied as being within the decision announced by us June 10, 1938, in Ford Motor Company v. N. L. R. B., 6 Cir., 99 F.2d 1003, affirmed 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221, though on petition for certiorari based upon other grounds of challenge. The motions were passed to the hearing and will be disposed of by this decision.

After the Board had set aside its original order upon our grant of its petition to withdraw its first enforcement petition as disclosed by the above citations, a revised decision was announced as having been made upon reconsideration of the entire record. It comprised revised findings of fact and conclusions of law, and included an order commanding the respondent to cease and desist from:

(a) Discouraging membership in International Union, United Automobile Workers of America or any labor organization of its employees by discharging or refusing to reinstate any of its employees or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment because of their membership in, activity in behalf of, or sympathy toward any such labor organization;

(b) Threatening, assaulting, beating, or in any other manner interfering with, restrain-

ing, or intimidating, directly or indirectly, members of International Union, United Automobile Workers of America or any other labor organization of its employees distributing or otherwise disseminating union literature in the vicinity of its River Rouge plant;

(c) Interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act by circulating, distributing or otherwise disseminating among its employees statements or propaganda which disparages or criticizes labor organizations or which advises its employees not to join such organizations;

(d) In any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, or to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act.

In addition to its cease and desist provisions the order directed the respondent to take affirmative action which included reinstatement to their former positions of 24 of its employees, without prejudice to their seniority and other rights; that they be made whole for loss of pay during the period following their discharge, except that any monies received by such employees during that period for work performed upon federal, state, county, municipal or other work-relief projects, should be paid over to the appropriate fiscal agency for such governments as supplied the funds for the projects. The order likewise contained the usual provisions for the posting and maintaining of notices that the cease and desist provisions of the order and its requirements for affirmative action would be complied with by the respondent.

The answer and cross-petition challenge the validity of the order and allege that it must be set aside or denied enforcement on numerous grounds, including failure of the trial examiner to act fairly, impartially, and in a judicial manner, and because he openly showed his bias and prejudice at the hearing and his belief from the beginning that the respondent was guilty of the unfair labor practices charged in the complaint. They attack the decision of the Board because of its reliance upon an erroneous "background" for the unfair labor practices; because the Board failed to consider facts and circumstances which ought to have been considered; because its findings, conclusions, and order with respect to the respondent's publications are not authorized by the Act and do not embrace the basic facts needed to sustain them; because the order is erroneous as a matter of law, even if the findings are correct; and because it is too broad in scope and so not authorized by the Act.

The unfair labor practices charged to have been engaged in by the respondent include assaults alleged to have been made under its authority or sanction upon certain union organizers, employees, and others, to prevent distribution of union literature in the so-called riot of May 26, 1937, and upon May 27, 1937; the distribution of anti-union literature among its employees by the respondent; the taking and publicizing of a so-called "Vote of Confidence" by employees expressing approval of the respondent's labor policy; and the discriminatory discharge of 24 employees for union activity. The evidence held by the Board to sustain its findings of unfair labor practices, either directly or by reasonable inference, together with that supporting the challenge to its inferences, the circumstances constituting the background considered, and those which are urged should have been considered, will be briefly treated in relation to the specific findings of the Board and the challenge to the validity of particular provisions of its order. We are obliged first to consider the more general charge of unfairness and partiality in the hearing by the trial examiner, and whether the respondent was thereby prejudiced or denied that due process which, above and beyond all else, constitutionally protects those charged with violations of law from captious and arbitrary exercise of authority.

The grievance, with respect to the hearing as conducted by the trial examiner, is directed principally to a bias said to have governed the examiner's conduct toward witnesses, his interference in the examination, in a highly partisan manner, for the purpose of eliciting testimony favorable to the Board's case, and by a hostile and abusive attitude toward witnesses called by the respondent, tending to intimidate them. It led him also, it is asserted, to arbitrary limitations upon cross-examination by re-

spondent's counsel, and to an abusive attitude toward him, which, it is said, encouraged the Board's witnesses to color their testimony so that it damaged the respondent's cause, and added to the intimidation of its witnesses.

■ We may accept as fundamental, the axiom that a trial by a biased judge is not in conformity with due process of law. Tumey v. Ohio, 273 U.S. 510, 522, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L.R. 1243; Jordan v. Massachusetts, 225 U.S. 167, 176, 32 S. Ct. 651, 56 L.Ed. 1038; Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U. S. 292, 294, 57 S.Ct. 724, 81 L.Ed. 1093. Not all departures from strict propriety, however, justify a reviewing court in setting aside decision in a hearing upon which so much time and effort has been spent as upon this. Material prejudice to the interest of the complaining litigant must clearly appear. It may be conceded that the trial examiner in the present case overstepped the bounds of that judicial propriety which contestants have a right to expect not only from courts but from administrative tribunals, and is so conducive to public confidence in their adjudications, and that he manifested a peculiar concept of the nature of the judicial function he was called upon to exercise. Indeed, the Board does not condone his lapses. We must keep in mind, however, that ultimate decision was not his but that of the Board; that he made no intermediate report or recommendation; that there were substantially no objections preserved on the record to his rulings upon the admission or exclusion of evidence, and no motion to suppress evidence made either before the examiner or the Board prior to the announcement of the Board's original decision. There is no contention here that material evidence taken by the examiner was suppressed, or that the respondent was not given full and adequate opportunity to affirmatively develop its defense against the charges contained in the complaint. The injudicious conduct of the trial examiner reaches no such clearly prejudicial impropriety as was held to invalidate the decisions of the Board in Inland Steel Co. v. N.L.R.B., 7 Cir., 109 F.2d 9; Montgomery Ward & Co., Inc., v. N. L. R. B., 8 Cir., 103 F.2d 147, 157.

In the limited respect in which we sustain the order of the Board, in the judicial notice that we take of the labor situation in the automotive industry at the time of the alleged unfair labor practices which the respondent claims it was prevented from developing by unfair restriction upon cross-examination, and in the consideration which we have given to facts and circumstances upon which the respondent itself relies for inferences antithetical to those of the Board and so does not traverse, the prejudice urged by the respondent to result from the improprieties of the trial examiner appears to rest upon pure speculation. We are not unmindful of the view that once impropriety appears prejudice will be presumed and need not specifically be proved. Inland Steel Co. v. N. L. R. B., supra. We are not in conflict with it insofar as it comprehends the inevitability of substantial prejudice even though incapable of precise exposition. In this respect, each decision must be based upon the peculiar facts of the case involved and the kind and degree of the impropriety [Cupples Co. Manufacturers v. N. L. R. B., 8 Cir., 106 F.2d 100, 113], upon the appraisal thereof made at the time by the parties themselves, and with regard to the result of the review as it bears upon issues, the determination of which may not have been affected by the impropriety. We conclude that the injudicious conduct of the trial examiner was not such as clearly to warrant setting aside those provisions of the Board's order that we direct to be enforced.

The riot of May 26, 1937, during which a number of officers of the union, and others, including men who may fairly be said to come within the definition of "employees" within the meaning of Section 2 of the Act, were found to have been viciously and brutally assaulted by a number of Ford service men while attempting to distribute literature, forms the basis for one of the principal unfair labor practices found by the Board to have been committed. The inference drawn by the Board as to its cause and origin is said to have no substantial basis in the facts disclosed by the record when these are projected against a background of labor terrorism which the Board failed and of which we are urged to take judicial notice.

There is evidence that a group of U. A. W. men, known as the Ford Organizing Committee, had arranged to distribute union leaflets to workers at the respondent's River Rouge plant, and that from 50 to 75 persons, the majority of whom were women, were selected to pass out the handbills. They arrived at the plant on the

afternoon of May 26, 1937, an hour and a half before the change of shifts. The union leaders proceeded to gate 4 where entrance to the plant is by means of an overpass across a public highway. Photographers employed by Detroit newspapers, informed of the proposed distribution, were present and took the pictures of the group which are in evidence. Presently appeared a number of Ford service men, who announced that the over-pass was Ford property and forcefully; if inelegantly, directed immediate departure therefrom. The union group without belligerent response turned to leave, whereupon the assault upon them took place. Other members of the union in the vicinity of gate 4, were likewise subject to attack. Newspapermen, attempting to take pictures, were pursued by service men intent upon destroying the films or plates, and attempted distributions at gates 9, 10 and 1 encountered like opposition. The next day there was an unprovoked assault upon U. A. W. men driving by the respondent's plant, in which a Ford service man participated. From the evidence credited by the Board thus condensed, placed against a background of Ford's previously announced anti-union views, the Board found that the attacks upon union members and sympathizers were attributable to the respondent, and that it thereby interfered with, restrained, and coerced its employees in the exercise of rights guaranteed in Section 7 of the Act, such rights, of course, including the right of self-organization; to form, join and assist labor organizations; and to bargain collectively through representatives of their own choosing.

If the events of May 26 and 27 thus delineated by substantial evidence credited by the Board, point directly or by reasonable inference to assaults upon union organizers, with the purpose of preventing the distribution of union literature, its seizure, and the driving away from the plant gates of those selected to distribute it by persons acting under the authority of the respondent, or with its sanction or approval, then undoubtedly the respondent interfered with the rights of its employees guaranteed to them by the National Labor Relations Act, and such interference is an unfair labor practice sustaining the appropriate remedial provision of the Board's order. The respondent, however, paints a different picture and requires for it a setting of the condition of the times, which, it says, it was not permitted by the examiner fully to develop, was not considered by the Board, of which the court may take judicial notice, or declining to do so, should grant its motion to remand the case to the Board for the taking of additional evidence.

The setting in which the respondent places the riot is the industrial turmoil which began late in 1936 when a wave of sit-down strikes became a national phenomenon with its incidence most conspicuous in the automobile industry in Michigan. The protracted sit-down strikes in the plants of General Motors and Chrysler began in December, 1936, and continued through March, 1937, and by them it was demonstrated that a small minority of employees could, with the aid of outsiders, forcibly take control of an industrial plant, stop production, and throw all of the men normally employed, out of work. It was also demonstrated that the regular agencies of law enforcement would, in such situation, be unable or unwilling to take the drastic measures required to evict the strikers so that normal legal remedies were not available to owners of seized property. It is urged that there were repeated public threats by U. A. W. and C. I. O. leaders to inaugurate a sit-down strike in the respondent's plant, and that the Board should have recognized that the violent and lawless methods of the U. A. W. at other plants might have led some of the respondent's 80,000 employees to take active measures in opposition, and so would reasonably explain the violence committed upon union organizers upon grounds other than respondent's opposition to unionization, and its pursuit of a purpose to interfere with employees' rights of self-organization. It says that the Board's complete disregard of this setting gives an entirely distorted impression of the riot, as well as of other alleged unfair labor practices, and that the evidence in support of them could not properly be appraised, or its probative force be determined, without consideration of the background of the sit-down strikes, the threat to extend them to the plant of the respondent, and the preparations to resist such strikes there made. The cease and desist order, it contends, is therefore invalid because the Board failed to consider facts and circumstances which, because pertinent, it was required to consider. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033;

Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288.

█ That we may judicially note an industrial phenomenon so widely publicized and so much discussed as was the forcible and unlawful seizure of industrial property by groups of ill-advised and determined men in the period under consideration, we have no doubt. The court may not close its eyes to what was referred to at the time by the then Governor of Michigan, as "the greatest industrial conflict of all times." That such seizure of property was illegal was never doubted by the thoughtful and the well-informed. Its illegality is now specifically adjudicated by highest authority. National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. No one who lived through the period can ignore the terror which this lawless labor technique imposed not only upon the automobile industry and its non-union employees fearing loss of their jobs, but upon all employers of labor in Michigan, including manufacturers, retail establishments, hotels, public utilities and others. Nor may the fact be forgotten that normal, legal remedies were then of no avail in the area to protect private property against unlawful seizure, or to restore its owners to possession when unlawfully seized. Humane reluctance to plunge the state into an orgy of violence and bloodshed stayed the hand of authority—who shall say unwisely?

In this situation it may be assumed that the respondent was justified in the precautions it took to protect its plant from seizure, either by employees from within, or by others from without. It had reason to fear that there would be an attempt to seize the gates of the River Rouge plant and to invade it for the purpose of staging a sit-down strike. It increased the number of its service men stationed at each gate on May 26. The gates were either locked or kept in such position that they could be locked at a few moments' notice. At gates which could not be locked Ford trucks were strategically placed so that, if necessary, they could be driven into position to block the road against an invading motor cavalcade. Expecting that trouble, if it came, would most likely be at gate 4, principal entrance to the plant, a group of 50 to 75 men of the service department, was kept in readiness to repel invasion at that point. Other precautions need not be detailed.

█ The conclusion is, however, inescapable that the preparation of the respondent to prevent the seizure of its property was more than adequate to repel an attempted seizure which the approach of 50 to 75 union organizers, mostly women, might signify even to the most fearful, as imminent. Even assuming that the respondent had reasonable grounds to believe that the ostensible purpose of the organizers to distribute union literature was but a blind to conceal an attempt to stage a sit-down strike, the assault upon them was not necessary for the safeguarding of the respondent's property, nor was it provoked by the union men. The finding of the Board that it was attributable to the respondent, is sustained by evidence that the assailants on the over-pass included two foremen of the River Rouge plant and a member of the service department, and that other service department employees took more or less prominent parts at other points, but also by credible evidence of the interview between newspaper men and Everett Moore, chief of the respondent's service department, prior to the riot.

The reporters were expecting trouble and appeared on the scene with photographers. They interviewed Moore as to whether they would be able to take pictures without interference, and asked whether the respondent was going to do anything to prevent the distribution of literature. They were told that the service department would take no action to prevent distribution but that some loyal employees might resent it, and that if they did it wouldn't be the fault of the Ford Motor Company. The reasonable inference from this evidence, which the Board drew, was that the head of the respondent's service department knew that the ostensible purpose of the union men was to distribute literature; that he expected it would be met with violence; and that he would take no action to prevent it, indulging the belief that if it occurred it would not be the fault of the Ford Motor Company. It is clear, from the evidence, that the service men were under the immediate direction and control of Moore; that production employees were not, at the time, in substantial number in proximity to gate 4 since it was still an hour or more before the afternoon change of shifts; and that though trouble was anticipated, not only were no steps taken to avoid it, but it was precipitated

and continued by men directly subject to Moore's orders. In this situation the respondent may not deny responsibility whether the doctrine of respondeat superior is applicable, in strict literalness, to such cases, or not. See Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38, 44, announced by us June 27, 1940. Nor is it enough to say that the event was but a normal manifestation under provocation of human behavior, since it was anticipated and could easily have been prevented. The finding that the assaults upon the union organizers constituted an unfair labor practice, must be sustained, and the remedial provisions of the order, based upon such findings, enforced. This is without regard to the fact that there was no finding by the Board as to the particular employees who were restrained or coerced in the enjoyment of their right to self-organization, since ultimate findings by necessary implication include intermediate fact findings. National Labor Relations Board v. Nat'l Motor Bearing Co., 9 Cir., 105 F.2d 652. There is at least substantial evidence of the direct intimidation of Llewellyn, an employee of the respondent who attempted to distribute leaflets near gate 1, and it has been held that one instance is enough to justify an injunction. National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 869, certiorari denied 304 U.S. 576, 585, 58 S.Ct. 1046, 82 L.Ed. 1540.

 The Board found that on or about June 1 there was circulated throughout the respondent's River Rouge plant, a "Vote of Confidence" in the policies of Henry Ford; that the circulation took place in the presence of some of the respondent's foremen; that in many cases employees were asked by foremen to sign; and that those refusing to do so had their badge numbers taken, as a result of which most of the employees did sign. The Board further found that the respondent then publicized the vote as an endorsement of its labor policies and as a rejection of the U. A. W., and that the circularization and publication of this vote interfered with, restrained, and coerced the respondent's employees in the exercise of rights guaranteed by Section 7 of the Act.

It is somewhat difficult to reconcile this finding with the dismissal by the Board of the allegation in the complaint that the respondent dominated and interfered with the formation and administration and con-

tributed to the support of a labor organization known as the Ford Brotherhood of America, Inc., since both alleged activities were necessarily inter-related, and the evidence in support of both is similar in character. We are controlled, however, by the mandate of the statute that factual determinations are conclusive upon us, if supported by substantial evidence, and we are unable to reject the finding of the Board as unsupported. It must be noted that this unfair labor practice is not made the subject of a specific remedial provision of the order, and is not imperative to the sustaining of a cease and desist provision, already amply supported by findings with respect to assaults upon union organizers, to prevent the distribution or dissemination of union literature in the vicinity of its River Rouge plant.

This brings us to the major issue, at least from the point of view of the public interest, with respect to the validity of the cease and desist order. About the first of April, 1937, copies of the Ford Almanac were distributed by the respondent to its employees, containing uncomplimentary references to labor organizations, including a column under the title "Musings of Smokestack Joe," and during May there was likewise distributed to the respondent's employees, a reprint in pamphlet form, of an interview given by Mr. Henry Ford to the North American Newspaper Alliance, and entitled, "Ford Gives Viewpoint on Labor." The Board found that the manner in which the respondent distributed the two publications constituted interference, restraint, and coercion of its employees in the exercise of rights of self-organization; that they had the unmistakable purpose and effect of warning employees that they should refrain from joining the union; that no employee could fail to understand that if he disregarded the warning he might find himself in difficulties with his employer, and that such fear was the natural and inevitable result of their distribution, particularly in view of the fact that prior thereto the respondent had discharged a number of employees because of union activity. At least, in the view of the Board, the publications indicated to the employees that the respondent would regard anyone who joined the union as a gullible, foolish person, and that employees could not fail to believe that in matters of promotion or selection of men for lay-offs, such an opinion would have weight.

The dissemination of statements or propaganda by the respondent which disparages or criticizes labor organizations, is incorporated in a specific mandate of the order sought to be enforced, and is vigorously attacked by the respondent as unauthorized by law, and if so authorized, in violation of the right of free speech guaranteed to all by the First Amendment to the Constitution.

 The right of employees to organize for collective bargaining, to select representatives of their own choosing, and to unite for concerted action in other respects, is now so clearly recognized as a fundamental right that citation is superfluous. The right to hold views upon any and all controversial questions, to express such views, and to disseminate them to persons who may be interested, has even more venerable sanction. This, the Board, in argument and brief, clearly recognizes by the distinction it seeks to draw between the right of Mr. Ford generally to express his labor views, and his right to distribute literature expressing such views to his employees in the manner adopted. The latter, it holds, had the effect of interference, restraint or coercion, condemned by the statute. We have difficulty in sensing the distinction. The right to form opinion is of little value if such opinion may not be expressed, and the right to express it is of little value if it may not be communicated to those immediately concerned. As was said in a recent case involving the application of the Fourteenth Amendment, which embraces the same fundamental concept of liberty as is guaranteed by the First, Jesse Cantwell et al.

v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 906, 84 L.Ed. 1213, announced May 20, 1940: "To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

The Board stresses the fact that the Ford pamphlets were put into the hands of each individual employee instead of in the box at the gate in the usual manner, and this unusual emphasis on the accused literature is that which constitutes the interference, coercion, and restraint condemned in its findings. It is the manner of distribution that is "the heart of the offending." But as said in Schneider v. State of New Jersey (Town of Irvington),*308 U.S. 147, 60 S.Ct. 146, 152, 84 L.Ed. 155, citing Lovell v. Griffin, 303 U.S. 444, 58 S. Ct. 666, 82 L.Ed. 949, "Pamphlets have proved most effective instruments in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people". We are unable to sense distinction between giving a pamphlet to a workman at the factory gate and delivering one at his home.

The alleged coercive language of the Ford publications are printed in the margin. [1] It will be noted that they contain no threat of discharge or discrimination and

---

[1] "Ford Gives Viewpoint on Labor"

"But, now along comes another group that says: 'There are 100,000 jobs out at Ford's. If you want one of them, pay us a registration fee, and so much every month, and we will pass you in, and you can work as long as you pay us.' This group is asking us to sit still while it sells our men the jobs that have always been free. If we agree to this, they would have complete control of American labor, a control no one has ever before had.

"I have never sought to prevent our men from joining any association—religious, racial, political, or social. No one who believes in American freedom would do that. When our men ask about unions, I give them the same advice as when they ask about any of the other schemes that are always aimed at workingmen's wages. I say to them: 'First, figure out for yourself what you are going to get out of it. If you go into a union, they have got you, but what have you got?'

"We think our men ought to consider whether it is necessary for them to pay some outsider every month for the privilege of working at Ford's. Or, whether any union can do more for them than we are doing.

"If the union leaders are sincere, they should go into business themselves.

"* * * I have always made a better bargain for our men than an outsider could. We have never had to bargain

Mr. Ford makes it plain that no threat of discharge is intended—"I have never sought to prevent our men from joining any association—religious, racial, political, or social. No one who believes in Amercian freedom would do that."

 Nowhere in the National Labor Relations Act is there sanction for an invasion of the liberties guaranteed to all citizens by the First Amendment. The Board, however, urges that these rights are qualified and not absolute, and that there are circumstances under which an expression of view upon labor policies by an employer is within the condemnation of the statute as constituting interference and coercion, and that the present situation, set against a background of publicly declared opposition by Mr. Ford to the unionization of his plant, brings the challenged publications within the definition. We do not ignore the view that "any sort of influence exerted by an employer upon an employee, depending upon his employer for means of livelihood, may very easily become undue in that it will coerce the employee's will in favor of what the employer desires against his better judgment." Virginia Ry. Co. v. System Federation No. 40 et al., 4 Cir., 84 F.2d 641. This holds the employer forever suspect and in practical application must necessarily silence him whose opinion may be the best informed, no matter how honestly his views may be entertained, or how truthful may be his observations. If the concept that an employer's opinion of labor organizations and organizers must, because of the authority of master over servant, nearly always prove coercive, ever had validity, it is difficult now to say, in view of the National Labor Relations Act, its adjudication as constitutionally valid, its strict enforcement by the National Labor Relations Board, and the liberal attitude of the courts in construing it so as best to effectuate its great social and economic purpose, that the concept is still a sound one. The servant no longer has occasion to fear the master's frown of authority or threats of discrimination for union activities, express or implied.

 That grave responsibility confronts a court whenever in course of litigation it must reconcile the conflicting claims of liberty and authority, or when one liberty collides with another, has already been noted. Minersville School District v. Walter Gobitis, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493, announced June 3, 1940; Cantwell v. State of Connecticut, supra. In the first of the citations a claim to freedom of religious view, assumed to be real and not fanciful, was compelled to give way to the more fundamental concept of a need for preserving the very existence of organized political society, the destruction of the foundations of which would destroy all liberties including that which the court was there urged to preserve. By that token, freedom of speech guaranteed without exception to all, is the more fundamental right here involved. "Of that freedom one may say that it is the matrix, the indispensable condition, of nearly every other form of freedom." Mr. Justice Cardozo in Palko v. Connecticut, 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288. Without it the very right which the Board seeks to protect by its cease and desist order, the right to organize, to seek converts to unionism and collective bargaining, itself would be of little value. As the Supreme Court has recently said in Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093: "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." Citing Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Schneider v. State of New Jersey (Town of Ir-

---

against our men, and we don't expect to begin now.

"Fordisms

"A Monopoly of Jobs in this country is just as bad as a monopoly of Bread!"

"Our men ought to consider whether it is necessary for them to Pay Some Outsider Every Month for the Privilege of Working at Ford's."

"What was the result of these strikes— merely that numbers of men put their necks into an Iron Collar. I'm only Trying to Show Who Owns the Collar."

"Figure it out for yourself. If You go into a union they have Got You—but what have You got?"

"We have always made a better bargain for our men than an outsider Could. We have never had to bargain against our men and we don't expect to begin now."

"There is no mystery about the connection between Corporation Control and Labor Control. They are the Two Ends of the Same Rope. A little group of those who Control Both Capital and Labor will sit down in New York and settle Prices, Dividends—And Wages."

vington), supra. To the argument of the Board that the potentiality of opinion to coerce is to be tested by whether it did in fact coerce, the Supreme Court in the same case makes answer: "It may be that effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests."

■ We have previously observed [Midland Steel Products Co. v. N. L. R. B., 6 Cir., 113 F.2d 800, 804, announced June 27, 1940], "Unless the right of free speech is enjoyed by employers as well as by employees, the guaranty of the First Amendment is futile, for it is fundamental that the basic rights guaranteed by the Constitution belong equally to every person."

■ Finally, it must be said that if denial of free expression by an employer on labor is ever justified by a judgment that it is coercive, it is not enough to set the publications here condemned against a background of alleged discriminatory discharges of 24 employees out of a total of 80,000 men, especially when it is noted that the Ford Almanac was distributed when but three employees had been discharged for alleged union activity, and the other literature distributed when but five more had been discharged, and the record fails to disclose that such discharges or the reason for them had been generally known in the respondent's plant. Basic Constitutional rights are not thus lightly to be whittled away. We are forced to the conclusion that the findings of the Board declaring the Ford publications and their distribution to be in pursuance of an unfair labor practice, must be set aside and the appropriate provision of the order commanding restraint denied enforcement.

■ Out of the 35 alleged discriminatory discharges of Ford employees for union activity, the Board found 11 not sustained, and the respondent was directed to reemploy the remaining 24 men and to make them whole for lost earnings. With respect to all but one of the 24 men ordered reinstated, there is evidence which, if credited by the Board, supports the inference that the discharge was for union activity. It is not our province to invade the fact-finding powers of the Board. It will be of no profit to analyze the evidence with respect to the discriminations. In a number of instances there was testimony of a superior that the man discharged was a good man and that the reason for discharge was membership in the U. A. W. In each case there was something for the Board to consider by way of union activity, refusal to sign the "Vote of Confidence," or other incident which came to the respondent's knowledge, to account for the discharge. In a few cases no explanation was offered on behalf of the respondent, and in other instances the reasons advanced might well have been considered lacking in persuasiveness. It is immaterial that the court, upon a consideration of the evidence, might have reached another conclusion in respect to some or all of the alleged discriminatory discharges. We must accept the findings of the Board.

■ The case of Emil Tomkow alone deserves special consideration. He was discharged on April 15. He did not join the union until May, although his sympathy with its objectives may have existed in March. The finding that he was discharged for union activity rests upon no more substantial basis than uncorroborated hearsay evidence challenged by credible testimony of a superior that he was discharged for cause. We are not bound by such finding. National Labor Relations Board v. Empire Furniture Corp., 6 Cir., 107 F.2d 92; National Labor Relations Board v. Thompson Products, 6 Cir., 97 F.2d 13. The direction for the reinstatement of Tomkow, contained in the order, must be denied enforcement.

■ The challenge to that provision in the order which requires the respondent to compensate the several governmental work-relief agencies to the extent of funds supplied to discharged employees, need not presently be adjudicated. The precise question is now pending in the Supreme Court upon the granting of a petition for writ of certiorari to the Circuit Court of Appeals for the Third Circuit, in Republic Steel Corp. v. N. L. R. B., 310 U.S. 655, 60 S.Ct. 1072, 84 L.Ed. 1419. The remaining

issues raised by the respondent have been fully considered even though not presently discussed in an opinion already too extended, except as criticism of the order as being too broad must be noted. The orders of the Board are preventive and remedial and not in any sense punitive. Many of like breadth have been decreed enforcement, although not perhaps in the face of the precise attack here made. If occasion for and need of restraint appears, it is not valid ground for objection that restraint, in some aspects, is broader than the offense.

It follows from what we have said, that the following disposition must be 'made of the case:

1. The several motions and petitions of the respondent, not previously adjudicated, are overruled.

2. The cease and desist provision, 1(c), of the order, forbidding the dissemination of propaganda by the respondent among its employees, is set aside and denied enforcement.

3. The affirmative command of the order, 2(a), directing reinstatement of discharged employees, is amended by striking from it the name of Emil Tomkow.

4. Section 2(b) of the order is amended by striking therefrom the words, "and pay over the amount, so deducted, to the appropriate fiscal agency of the Federal, State, county, municipal or other governments which supplied the funds for said work-relief projects."

5. A decree may be entered commanding enforcement of the remaining provisions of the order and as amended.

It is so ordered.