224 F.2d 649
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SHIRLINGTON SUPERMARKET, Inc., and Its Subsidiaries, Shirley Food Store No. 1, Inc., Shirley Food Store No. 2, Inc., Shirley Food Store No. 5, Inc., Shirley Food Store No. 6, Inc., and Westmont Supermarket, Inc., Respondent.
 No. 6968.
 United States Court of Appeals Fourth Circuit.
 Argued May 23, 1955.
 Decided July 25, 1955.
 
 Fannie M. Boyls, Atty., N. L. R. B., Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, N. L. R. B., Chicago, Ill., David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Ruth V. Reel, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.
 Joseph F. Castiello, Washington, D. C. (Nathaniel Goldberg and Martin J. Kirsch, Washington, D. C., on the brief), for respondent.
 Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.
 PARKER, Chief Judge.
 
 
 1
 This is a petition to enforce an order of the National Labor Relations Board directing the Shirlington Supermarket and its subsidiaries to bargain with a union which had been chosen and certified as a bargaining representative of their employees. No unfair labor practice other than the refusal to bargain is involved in the case. The refusal to bargain was based upon the fact that the union had lost a representation election on September 6, 1952, which the Board had set aside, the employer contending that this action of the Board was void and that the subsequent election of February 7, 1953, at which the union won, was likewise void because held within twelve months of the first election. The only question in the case is whether the action of the Board in setting aside the first election was so unreasonable as to amount to an abuse of discretion on its part in the exercise of the power vested in it to supervise and conduct representation elections.
 
 
 2
 The facts are that the Regional Director of the Board, who investigated the election upon complaint of the union, filed a report in which he recommended that the election be set aside on the basis of the following finding:
 
 
 3
 "Investigation reveals that eligible employees were temporarily relieved of their duties, assembled, and addressed on company time and property by employer-representatives who, inter-alia, urged the employees to vote against the Union. These speeches began approximately 1½ hours before the start of the election and in some instances were being delivered while the election was actually in progress.
 
 
 4
 "In the opinion of the undersigned, the timing of the speeches denied a substantially equal opportunity for presentation of the Union's views and was tantamount to a refusal to consider a request by the Union to reply. Nor was the timing of the employer's speeches counteracted by the absence of evidence as to a no-solicitation rule or the opportunities which the Union may have had to present its views to the employees under such circumstances."
 
 
 5
 The Board's reasoning in setting aside the election was as follows:
 
 
 6
 "The Regional Director found that eligible employees were temporarily relieved of their duties, assembled, and addressed on company time and property by employer-representatives who, inter-alia, urged the employees to vote against the Union; and that these speeches began approximately 2½ hours before the start of the election and in some instances were being delivered while the election was actually in progress. As to these findings, the Employer denies only that these speeches in some instances were being delivered while the election was actually in progress.
 
 
 7
 "Even accepting the employer's denial, we find, as the Regional Director did, that the time of the speeches denied a substantially equal opportunity for presentation of the Union's views and was tantamount to a refusal to consider a request by the Union to reply; and that the timing of the employer's speeches was not counteracted by the absence of evidence as to a no-solicitation rule or the opportunities which the Union may have had to present its views to the employees under other circumstances. We find further, as we have under similar circumstances, that such conduct by the Employer was discriminatory and prejudiced that atmosphere we believe is essential to a fair exercise of their franchise by the voters."
 
 
 8
 The election was accordingly set aside on the basis of the rule which the Board was enforcing at the time to the effect that an election would not be allowed to stand if the employer immediately preceding the election had addressed the employees on company time and on company premises without allowing the union an adequate opportunity to reply. See Bonwit Teller, 96 N.L.R.B. 608. Since then the rule has been modified so that it is now held that an election is invalidated if either side addresses the employees on company time and premises within 24 hours of an election, irrespective of the opportunity to reply (see Peerless Plywood Co. et al., 107 N.L.R.B. 427); but we need not consider this modification of the rule, as it is perfectly clear that the action of the Board cannot be condemned as arbitrary or unreasonable under the original rule which it applied. Whether a representation election has been conducted under conditions compatible with the exercise of a free choice by the employees, is a matter which Congress has committed to the discretion of the Board. N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322. As said in N. L. R. B. v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 503, 84 L.Ed. 704, in which an election was invalidated by the Board, "The control of the election proceeding, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone. Interference in those matters constituted error on the part of the court below." In N. L. R. B. v. National Plastic Products Co., 175 F.2d 755, 758. this court said: "The determination of bargaining representatives under the act is a matter that Congress has entrusted to the Board, not to the courts; and when, as here, a certification is called in question in connection with a petition to enforce or review an order of the Board under section 10, 29 U.S.C.A. § 160, the certification must be sustained in so far as fact questions are concerned, if the fact findings of the Board made in connection therewith are based upon substantial evidence. In so far as the certification involves the exercise of discretion, that is a matter with which we are powerless to interfere so long as the Board acts within the limits of the law. * * * it certainly was for the Board and not the courts to exercise the discretion as to when the election should be held, upon what payroll eligibility to vote should be determined and whether or not the election should be set aside for irregularities in procedure. For the courts to substitute their judgment for that of the Board in such matters would be for them to undertake an impossible task and entirely to misconceive their function under the statute."
 
 
 9
 The question before us is, not whether the action of the employer may be condemned as an unfair labor practice, but whether it furnished sufficient ground for the action of the Board in setting aside the election. While an unfair labor practice might or might not be ground upon which the Board would be justified in acting in invalidating an election, infringement of rules adopted to secure a fair and untrammeled expression by the employees would unquestionably furnish such ground. As was said by the Board in the case of General Shoe Corporation, 77 N.L.R.B. 124, 126, 127:
 
 
 10
 "Conduct that creates an atmosphere which renders improbable a free choice will sometimes warrant invalidating an election, even though that conduct may not constitute an unfair labor practice. An election can serve its true purpose only if the surrounding conditions enable employees to register a free and untrammeled choice for or against a bargaining representative. For this reason the Board has sometimes set elections aside in unconsolidated representation cases, in the absence of any charges or proof of unfair labor practice. When a record reveals conduct so glaring that it is almost certain to have impaired employees' freedom of choice, we have set an election aside and directed a new one. Because we cannot police the details surrounding every election, and because we believe that in the absence of excessive acts employees can be taken to have expressed their true convictions in the secrecy of the polling booth, the Board has exercised this power sparingly. The question is one of degree.
 
 
 11
 "We think that the Board should apply no different standards in those occasional representation cases which happen to be consolidated with unfair labor practice proceedings for purposes of hearing and decision. On this record, therefore, although the respondent's activities immediately before the election, as described in the Intermediate Report, are not held to constitute unfair labor practices within the meaning of the amended Act, certain of them created an atmosphere calculated to prevent a free and untrammeled choice by the employees."
 
 
 12
 See also N. L. R. B. v. National Container Corp., 2 Cir., 211 F.2d 525; The Hills Bros. Co. et al., 100 N.L.R.B. 964.
 
 
 13
 Directly in point is the decision of the Court of Appeals of the Ninth Circuit in Foreman & Clark, Inc., v. N. L. R. B., 215 F.2d 396, 410, certiorari denied 348 U.S. 887, 75 S.Ct. 207, a case practically on all fours with the case at bar, where the court said: "Under the facts of this case, however, viewed in the light of the decisions applicable thereto, we agree with the Board's determination that that tailor-shop employees constitute an appropriate bargaining unit, and with its decision to set aside the first election because of the Company's last minute campaign speeches during working hours, under the circumstances already detailed. The latter decision was a proper exercise of the Board's `wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees.' National Labor Relations Board v. A. J. Tower Co., supra, 329 U.S. at page 330, 67 S.Ct. at page 328."
 
 
 14
 The fact that the Board no longer follows the holding of the Bonwit Teller case, to the effect that a non-coercive speech by an employer without adequate opportunity to reply is to be condemned as an unfair labor practice, is no reason why it should not hold such a speech prejudicial to a fair election and set aside the result of the election on that ground. The question here is not one of free speech or of unfair labor practices, but of the Board's judgment in holding last minute, one-sided appeals to employees on company time and property prejudicial to a fair election and setting the election aside for that reason. The soundness of the Board's judgment would seem to be demonstrated by the fact that the result of the election was different when the practices which the Board regarded as prejudicial were not engaged in. Certainly, we would not be justified in setting aside its action as an abuse of discretion in the light of the circumstances before us.
 
 
 15
 The order of the Board will be enforced.
 
 
 16
 Order enforced.
 
 
 17
 SOPER, Circuit Judge (dissenting).
 
 
 18
 When the facts of this case are made plain, it is seen at once that the decision lies between the privilege of free speech guaranteed by the First Amendment and the power of the Labor Board under the Labor Act to regulate the election of bargaining representatives for the employees. Insofar as they may seem to conflict, there is no choice but to uphold the mandate of the Constitution; and so the question at issue is, not whether the Board abused its discretion in setting aside the election of September 6, 1952, which the union lost, but whether the Board exceeded the constitutional limits of its power.
 
 
 19
 The facts, although inadequately set forth in the report of the Regional Director who conducted the election, are not in dispute. The company operated five retail grocery stores in Virginia near the City of Washington, whose 66 employees were found by the Board to constitute an appropriate bargaining unit; and the Board directed that an election be held to determine their wishes as to bargaining representatives. On the day of the election, about two and a half hours before it began, representatives of the company made a round of the stores and addressed the employees, who were relieved of their duties and assembled for the purpose, and urged them to vote against the union. The report of the Regional Director and the decision of the Board do not set out the contents of the speeches; but there is no showing that they contained any threat of reprisal or force or promise of benefit, and hence we may assume that they were completely unobjectionable. The report of the Director and the decision of the Board also fail to disclose what attempts the representatives of the union made to persuade the employees to vote for it. The Board, however, assumed that the company did not have a no-solicitation rule directed against the union, and hence we may safely accept the assertion of the Company that the union actually carried on its campaign for many days immediately prior to the election and spoke in every store to as many employees and as often as it desired. The speeches of the representatives of the Company on the day of the election seem to have been the Company's reply to the union, and the Company utilized only this one opportunity to influence the votes of its employees. The election was set aside simply on the ground that the timing of the speeches made by the representatives of the Company denied a substantially equal opportunity for presentation of the union's views and amounted to a refusal to consider a request by the union to reply.[1]
 
 
 20
 The decision was grounded entirely on a rule which had been promulgated by the Board in Bonwit Teller, Inc., 96 N.L.R.B. 608, where a representative of the employer addressed the employees in its store before the election but failed to grant the union's request for a similar opportunity. The rule, known as the Bonwit Teller Rule, was to the effect that an election is invalid where an employer assembles his employees on company time and property before an election and makes a campaign speech while denying or in effect denying the union a similar opportunity to address the employees. The decision of the majority of the court upholding the Board on the pending appeal expresses its approval of the rule in the statement "that the action of the Board cannot be condemned as arbitrary or unreasonable under the original rule which it applied."
 
 
 21
 This might be the end of the matter were it not for the fact, not heretofore mentioned, that the Bonwit Teller Rule has been definitely repudiated as invalid not only by the courts but by the Board itself. The decisions of the courts have not been uniform as to whether an employer is in duty bound under any circumstance to permit the union the privilege of addressing or soliciting the employees on the employer's premises. It was held by the majority of the court in Bonwit Teller, Inc., v. N. L. R. B., 2 Cir., 197 F.2d 640, that the action of the Board in that case should be sustained because the employer had a no-solicitation rule forbidding the union to solicit votes on the company's property at any time; and a majority of the court thought that it was unfair for the employer to make an anti-union speech in the store and then to deny union officials the right to speak to employees in the store, even during non-working hours. Judge Swan dissented because he thought that the employer had a perfect right to address his men on his own time and property and at the same time to forbid the union to solicit votes thereon.
 
 
 22
 The Sixth Circuit in a majority opinion in N. L. R. B. v. F. W. Woolworth Co., 214 F.2d 78, adopted the views of Judge Swan, while a dissenting judge was in accord with the view of the majority in the Second Circuit. The court sustained the right of an employer to address his employees in the exercise of the constitutional privilege of free speech and held that it was not unfair to deny the union the privilege of addressing or soliciting the employees on their employer's premises, especially as the union had ample opportunity elsewhere to seek out the employees and persuade them to vote in its favor. It is manifest that all of the judges in these two cases, in both the majority and dissenting opinions, would disapprove the action of the Board in the pending case, since it is conceded that the company permitted the representatives of the union freely to enter its stores at any time and solicit the votes of the employees.
 
 
 23
 The decisions of the Board have varied from time to time as to the extent to which an employer may go in urging his employees to reject the overtures of a union.[2] Hence it is of great interest, particularly to those who stress the discretionary control of elections vested in the Board by the statute, that the Board itself, prior to its decision in the pending case, condemned and repudiated its own Bonwit Teller Rule in the case of Livingston Shirt Corp., 107 N.L.R.B. 400, where the Board held that an employer was within his rights who addressed an anti-union non-coercive speech to assembled employees on his own premises on the day before the election, but denied the union a similar opportunity. The Board said (p. 406):
 
 
 24
 "* * * If the privilege of free speech is to be given real meaning, it cannot be qualified by grafting upon it conditions which are tantamount to negation.
 
 
 25
 "It is conceded by everyone that Congress intended that both employers and unions should be free to attempt by speech or otherwise to influence and persuade employees in their ultimate choice, so long as the persuasion is not violative of the express provisions of the Act; and we find nothing in the statute which even hints at any congressional intent to restrict an employer in the use of his own premises for the purpose of airing his views. On the contrary, an employer's premises are the natural forum for him just as the union hall is the inviolable forum for the union to assemble and address employees. * * * there remains open to them all the customary means for communicating with employees. These include individual contact with employees on the employer's premises outside working hours (absent, of course, a privileged broad no-solicitation rule), solicitation while entering and leaving the premises, at their homes, and at union meetings. These are time-honored and traditional means by which unions have conducted their organization campaigns, and experience shows that they are fully adequate to accomplish unionization and accord employees their rights under the Act to freely choose a bargaining agent.
 
 
 26
 "* * * The majority in Bonwit Teller did not cite, nor have we been able to find, any support in the statutory language or legislative history for holding that the employer who exercises his own admitted rights under the statute thereby incurs an affirmative obligation to donate his premises and working time to the union for the purpose of propagandizing the employees.
 
 
 27
 "* * * We reject the idea that the union has a statutory right to assemble and make campaign speeches to employees on the employer's premises and at the employer's expense. We see no real distinction in principle between this and admitting an employer to the union hall for the purpose of making an anti-union speech, a suggestion which our dissenting colleague would doubtless view with abhorrence. We believe that the equality of opportunity which the parties have a right to enjoy is that which comes from the lawful use of both the union and the employer of the customary fora and media available to each of them. It is not to be realistically achieved by attempting, as was done in Bonwit Teller, to make the facilities of the one available to the other."
 
 
 28
 Thus it appears, not only from the decision of the Courts of Appeals but from the decision of the highest administrative authority in this field, that the Board acted erroneously and without legal justification on January 15, 1953 when it set aside the election of September 6, 1952 on the basis of the Bonwit Teller Rule and ordered a new election. The employer, however, had no opportunity to protest under the approved procedure until the second election on February 7, 1953 which the union won.[3] Then the employer refused to bargain with the union and was found guilty of unfair labor practice by the decision of the Board of April 25, 1954 which is now under review. The Board was obviously in no position on that date to reaffirm its order of January 15, 1953 setting aside the first election on the basis of the Bonwit Teller Rule, because in the meantime on December 17, 1953 it had denounced that rule. It sought, however, to sustain its prior action on the basis of a new election rule which it propounded on November 17, 1953 in the case of Peerless Plywood Co., 107 N.L. R.B. 427. That rule is that an election will be set aside whenever an employer or a union makes an election speech on company time to massed assemblies of employees during the twenty-four hour period preceding the election. This rule seems on its face to be fair and evenhanded, because it applies both to the employer and to the union; but in effect it is aimed at the employer for it is most improbable that an employer, opposed to the union, would be willing to assemble the employees and permit them to be addressed by the union on company time. In any event, and whether or not the new rule is valid, despite its obvious interference with freedom of speech, it cannot be properly invoked in the pending case since it was not in effect at the time that the election campaign was being held. To invoke it at this time would be to deprive the employer of his opportunity to present his views in opposition to those which the union had fully set before the voters, and at a time when there were no restrictions or rules forbidding the employer from making a last minute appeal.
 
 
 29
 It is true that administrative action is not necessarily invalid because it has a retroactive effect. In Securities & Exchange Comm. v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 1760, 91 L.Ed. 1995, the court said:
 
 
 30
 "That such [administrative] action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law. See Addison v. Holly Hill [Fruit Products, Inc.], 322 U.S. 607, 620, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488."
 
 
 31
 That doctrine was applied in N. L. R. B. v. Guy F. Atkinson Co., 9 Cir., 195 F.2d 141, where the Board held that an employer in the construction business was guilty of an unfair labor practice when he discharged an employee because he had failed to maintain his union membership. At the time the discharge took place, the policy of the Board was to refuse to take jurisdiction in cases where the building and construction industry was involved; but subsequently it reversed its attitude and took jurisdiction in the Atkinson case. The court held that the action of the Board in changing its views and applying a contrary policy to the case before it could not be sustained. The court said, at page 149:
 
 
 32
 "We think it apparent that the practical operation of the Board's change of policy, when incorporated in the order now before us, is to work hardship upon respondent altogether out of proportion to the public ends to be accomplished. The inequity of such an impact of retroactive policy making upon a respondent innocent of any conscious violation of the act, and who was unable to know, when it acted, that it was guilty of any conduct of which the Board would take cognizance, is manifest. It is the sort of thing our system of law abhors."
 
 
 33
 Happily the court does not base its decision in the pending appeal on the ex post facto action of the Board.
 
 
 34
 The point to which the courts and the Board have now come, in holding that the Labor Act was not designed to deprive an employer of the right of addressing his employees on the subject of union membership, was not easily reached. Since the main purpose of the statute was to strengthen the arm of labor by empowering all employees to bargain collectively through representatives of their own choosing, it was once thought that the employer must maintain absolute impartiality when organization of his employees is taking place, and refrain from opposing the formation of a union.[4]
 
 
 35
 The matter was set straight by the Supreme Court in N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348, where a passing reference was made to the right of the employer under the First Amendment to express his views on labor policies and problems, and in Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430, where a Texas statute imposing restraints upon labor organizers in the exercise of their right to free speech and free assembly was declared to be in violation of the First and Fourteenth Amendments. The court said, 323 U.S. at page 532, 65 S.Ct. at page 323:
 
 
 36
 "* * * This Court has recognized that `in the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. * * * Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society.' Thornhill v. Alabama, 310 U.S. 88, 102, 103, 60 S.Ct. 736, 744, 84 L.Ed. 1093; Senn v. Tile Layers Protective Union, 301 U.S. 468, 478, 57 S.Ct. 857, 862, 81 L.Ed. 1229. The right thus to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly."
 
 
 37
 And in a concurring opinion Mr. Justice Jackson said, 323 U.S. at page 547, 65 S.Ct. at page 330:
 
 
 38
 "Free speech on both sides and for every faction on any side of the labor relation is to me a constitutional and useful right. Labor is free to turn its publicity on any labor oppression, substandard wages, employer unfairness, or objectionable working conditions. The employer, too, should be free to answer, and to turn publicity on the records of the leaders or the unions which seek the confidence of his men. And if the employees or organizers associate violence or other offense against the laws with labor's free speech, or if the employer's speech is associated with discriminatory discharges or intimidation, the constitutional remedy would be to stop the evil, but permit the speech, if the two are separable; and only rarely and when they are inseparable to stop or punish speech or publication."
 
 
 39
 In Thomas v. Collins, supra, the court cited two cases, 323 U.S. at page 537, 65 S.Ct. at page 326, as illustrations of the right given employers by the First Amendment to persuade their employees to join or not to join the union, namely, N. L. R. B. v. American Tube Bending Co., 2 Cir., 134 F.2d 993, 146 A.L.R. 1017, and N. L. R. B. v. Ford Motor Co., 6 Cir., 114 F.2d 905. In the American Tube Bending case Judge Learned Hand, speaking for the court, held that an employer did not violate the statute who, on the eve of an election, addressed his employees in opposition to the union without threat of reprisal, speaking to two shifts at 3 P.M. and a third shift at 11 P.M. on the day before the election was held. In the Ford Motor Co. case the court held that the distribution by the employer to the employees of literature containing uncomplimentary references to labor organization was an exercise of the privilege of free speech guaranteed by the Constitution and was not an unfair labor practice constituting undue interference with the rights of the employees. Commenting upon the argument of the Board that any sort of influence exerted by the employer upon the employee might easily become coercive, Judge Simons said, 114 F.2d 914:
 
 
 40
 "* * * If the concept that an employer's opinion of labor organizations and organizers must, because of the authority of master over servant, nearly always prove coercive, ever had validity, it is difficult now to say, in view of the National Labor Relations Act, its adjudication as constitutionally valid, its strict enforcement by the National Labor Relations Board, and the liberal attitude of the courts in construing it so as best to effectuate its great social and economic purpose, that the concept is still a sound one. The servant no longer has occasion to fear the master's frown of authority or threats of discrimination for union activities, express or implied."
 
 
 41
 Since this was written, fifteen years have passed during which the Labor Board has continued unremittingly its praiseworthy and effective efforts to secure for employees full freedom to bargain without interference so that throughout the country employees have come to realize their complete independence.
 
 
 42
 Congress has also spoken on this subject. It felt obliged to point out in the reports of its Committees, issued during the passage of the Labor Management Act, 29 U.S.C.A. § 141 et seq., that the Labor Board had not faithfully followed the decisions of the courts, but had placed a restricted construction thereon and thereby impaired the employer's right of free speech.[5] Hence Congress enacted § 8(c) of the new statute in the following words:
 
 
 43
 "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."
 
 
 44
 In the face of these pronouncements of the courts and of Congress, which would seem to be clear enough, the Board has adopted a new approach to the question. It no longer stigmatizes a non-coercive speech as an unfair labor practice but it asserts the right under certain circumstances to control the utterance of an employer as an exercise of power conferred upon it by the statute to conduct elections. It refrains from holding that an employer's actions immediately before an election constitute unfair labor practices and thus avoids the impact of Section 8(c) of the Act; but it reaches precisely the same end by invoking the provisions of Section 9 of the statute.
 
 
 45
 This appears from the decision in General Shoe Corporation, 77 N.L.R.B. 124, in which this device was used by the Board shortly after the new statute was passed. There the company's president expressed his anti-union views to the employees on the day before the election by bringing them into his own office in groups of twenty to twenty-five individuals and reading to each group the same intemperate anti-union address. The Board held that this conduct, and certain instructions of the employer to the foreman to propagandize employees in their homes, "created an atmosphere calculated to prevent a fair and untrammelled choice by the employees."
 
 
 46
 The Board declared that it is its function to provide an experimental "laboratory" in which the uninhibited desires of the employees may be ascertained under conditions as nearly ideal as possible, and that it is its duty alone to determine whether these conditions have been fulfilled. The sophistry in this argument is so obvious that it ought not to receive the approval of the court. The will of Congress, as set forth in Section 8(c) of the statute, cannot be evaded by changing the description of the conduct which the Board wishes to restrain. If an employer's speech is coercive to the extent that it prevents "a fair and untrammelled choice by the employees", it is by the very terms of the Act an unfair labor practice, for that occurs, using the language of Section 8, whenever an employer undertakes to interfere with or to restrain or to coerce the employees in the exercise of their rights.
 
 
 47
 The condemnation of the conduct of the employer contained in the Board's decision setting aside the election in the instant case is cast in the same mold. Referring to the speeches made by the employer before the polls opened on the day of the election the Board said: "We find further, as we have under similar circumstances, that such conduct was discriminatory and prejudiced that atmosphere we believe is essential to a fair exercise of their franchise by the voters." When we recall the innumerable instances in the past in which the Board has used similar phraseology to stigmatize anti-union utterances of managing officers and supervisors as violative of the act, we can have no doubt that the free speeches in this case amount to an unfair labor practice in the mind of the Board, and would have been so denominated but for the prohibitory words of Section 8(c) of the statute.
 
 
 48
 The error of the Board, however, is more fundamental. We are dealing not merely with statutory but also with constitutional rights. Section 8(c) of the statute was merely a restatement of the principle embodied in the First Amendment,[6] so that by ignoring the statute the Board invades a broader field and assumes a power to fix the constitutional limits of the privilege of free speech. There is nothing in Section 9 of the Act which purports to confer or could confer this power. The cases cited in the opinion of the court on this point clearly illustrate the nature of the control over election proceedings which the Board possesses and none of them involve the area of free speech. N. L. R. B. v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704, condemned the act of an employer who permitted the representatives of one union to make contact with men on shipboard while denying a similar opportunity to a rival union in a pre-election campaign. The principal question involved in N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322, and N. L. R. B. v. National Plastics Product Co., 4 Cir., 175 F.2d 755, was the eligibility of certain voters and the court held that matter to be within the exclusive discretion of the Board. In short, as said in N. L. R. B. v. Waterman Steamship Corp., 309 U.S. at page 226, 60 S. Ct. at page 503, "The control of the election proceeding, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone." But that holding is far from sustaining the view that the Board has the power in its discretion to fix the time and place of non-coercive speeches of management and labor in an election campaign, which do not actually interfere with the conduct of the election proceeding itself.
 
 
 
 Notes:
 
 
 [1]
 The Regional Director reported that in some instances the speeches were delivered while the election was in progress, but this statement was denied by the employer and the Board accepted the denial
 
 
 [2]
 See N. L. R. B. v. F. W. Woolworth Co., 6 Cir., 214 F.2d 78, 80; Livingston Shirt Corp., 107 N.L.R.B. 400, 407
 
 
 [3]
 Section 9 of the Act, 29 U.S.C.A. § 159, forbids an election within twelve months after a valid election
 
 
 [4]
 See Livingston Shirt Corp., 107 N.L.R.B. 400, 411-2
 
 
 [5]
 Senate Report No. 105, 80th Congress, 1st Sess. pp. 23-24: "Section 8(c) [29 U.S.C.A. § 158(c)]. Another amendment to this section would insure both to employers and labor organizations full freedom to express their views to employees on labor matters, refrain from threats of violence, intimidation of economic reprisal, or offers of benefit. The Supreme Court in Thomas v. Collins (323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430]) held, contrary to some earlier decision of the Labor Board, that the Constitution guarantees freedom of speech on either side in labor controversies and approved the doctrine of the American Tube Bending case (134 F.2d 993). The Board has placed a limited construction upon these decisions by holding such speeches by employers to be coercive if the employer was found guilty of some other unfair labor practice, even though severable or unrelated (Monumental Life Insurance, 69 N.L.R.B. 247) or if the speech was made in the plant on working time (Clark Brothers, 70 N.L.R.B. 802). The committee believes these decisions to be too restrictive and, in this section, provides that if, under all the circumstances, there is neither an expressed or implied threat of reprisal, force, or offer of benefit, the Board shall not predicate any finding of unfair labor practice upon the statement. The Board, of course, will not be precluded from considering such statements as evidence."
 See also House Conference Report No. 510, 80th Congress, 1st Sess. p. 45.
 
 
 [6]
 N. L. R. B. v. F. W. Woolworth Co., 6 Cir., 214 F.2d 78, 79