**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SCHAPIRO & WHITEHOUSE, INC., Respondent.**

No. 9906.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 4, 1965.

Decided Feb. 2, 1966.

Nancy M. Sherman, Atty., N.L.R.B., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Wayne S. Bishop, Atty., N.L.R.B., on brief), for petitioner.

Marvin C. Wahl, Baltimore, Md. (Blanche G. Wahl, and Wahl & Wahl, Baltimore, Md., on brief), for respondent.

Before BOREMAN and BRYAN, Circuit Judges, and MARTIN, District Judge.

ALBERT V. BRYAN, Circuit Judge:

Our first opinion in this case, NLRB v. Schapiro & Whitehouse, Inc., 353 F.2d 513 (4 Cir., 1965) related in detail the facts incident to the contest of the union's election as the bargaining representative of Schapiro's employees. Since our request the Board has opened the 3 sealed ballots and reports them as against the union. Thus the tally stands at 89 for and 88 against the union. In consequence we now decide Schapiro's threefold attack upon the election.

1. The Finkelstein ballot, presumably still unopened and a "No" vote, was challenged by the union on the ground that he was a supervisor. The Regional Director deemed unnecessary a determination of whether Finkelstein was a supervisor, but recommended rejection of the ballot on the ground that "he did not have sufficient community of interest with the other employees to warrant his inclusion in the unit" previously designated for bargaining representation. The Board followed the Regional Director's recommendation.

It was a "consent election" upon a stipulation signed by the union and the employer, and approved by the Board's agent and its Regional Director. "Eligible voters" and "The Appropriate Collective Bargaining Unit" were by agreement limited to:

"All production and maintenance employees, including truckdrivers at the Employer's Baltimore, Maryland, plant; but excluding office clerical employees, watchmen, guards and supervisors as defined in the Act."

Pursuant to the further provisions of the agreement "an accurate list of all the eligible voters, together with a list of the employees, if any, specifically excluded from eligibility" was furnished the Board by the parties. The list was approved by the union's representative as evidenced by his signature thereon.

Finkelstein was listed among the qualified voters. Aware before the election of his employment status, the union's deliberate abstention from any question of his inclusion in the representation unit, we think, barred its challenge of him after the election. The point is trenchantly made by Judge Wisdom in Shoreline Enterprises of America, Inc. v. NLRB, 262 F.2d 933, 943 (5 Cir. 1959) in these words:

"The basic policy—we endorse it—is that a company and a union must be held to their agreements, as any other party is held to an agreement. In cases involving a pre-election resolution of eligibility issues between a company and union it is especially important to hold the parties to their contract. To permit either to repudiate a pre-election agreement and redetermine the eligible members of a bargaining unit, *after* an election has been held, would enfeeble the consent election procedure."

Of course, the Board has the duty and power to supervise an election. The Board cannot delegate or abdicate this prerogative by or through an agreement between labor and management. Shoreline Enterprises of America, Inc. v. NLRB, supra, 262 F.2d 933, 943 (5 Cir. 1959). Nevertheless, this responsibility does not entitle the Board to abrogate an employer-union agreement unless, of course, the agreement impairs the opportunity of any eligible unit members to vote.

In NLRB v. Joclin Manufacturing Company, 314 F.2d 627, 633 (2 Cir. 1963), the Regional Director allowed two

employees to vote who were not within the bargaining unit as defined by an employer-union agreement. There was no specific list of eligibles. The stipulation was that "office, clerical and professional employees, guards and supervisors" should be disqualified to vote. Nevertheless the Regional Director permitted "plant clericals" to vote, on the basis that the agreement excluded only office clericals. The Court overruled the Board in its approval of the Director's ruling, and said:

> "There may, of course be situations where the agreement reached between company and union as to the appropriate bargaining unit should not be enforced by the Board because it improperly disenfranchises employees, see Shoreline Enterprises of America, Inc. v. N.L.R.B. supra, 262 F.2d at 944–946; but nothing would indicate this to be such a case, and in any event it is the agreement on which the Board is relying."

Our position finds reinforcement in NLRB v. J. J. Collins' Sons, Inc., 332 F.2d 523, 525 (7 Cir. 1964), Judge Castle saying for the Court:

> "It is conceded that the Board's exercise of 'informed discretion' in defining an appropriate bargaining unit is not to be upset unless the evidence compels a conclusion that it has acted arbitrarily, or from bias, or prejudice. But unlike in the cases cited, the bargaining unit here involved was defined and its limits circumscribed by stipulation of the company and the Union. And the Board's exercise of discretion was restricted by the Board to its approval of the unit as submitted by the parties. The factor of 'community of interest' and other elements of Toporek's duties might well have formed a rational basis for having included the job in the unit under some descriptive designation identifying it. But the Board did not do so. It did not so exercise the discretion it may have had in such con-

nection. And, considerations applicable when the Board makes its own independent determination defining the appropriate bargaining unit do not control here where it is merely interpreting the language used by the parties to define and limit the unit in a stipulation for a consent election. The primary question here is what the parties intended. N.L.R.B. v. Joclin Manufacturing Company, 2 Cir., 314 F.2d 627, 633–634."

Not only was the disqualification of Finkelstein rested by the Board on a premise—lack of sufficient community of interest with the unit—foreclosed by the agreement, but the union did not even challenge on that score. The idea was solely the Regional Director's.

The Board would dilute the stipulation with the argument that the "parties did not enter into a written and signed agreement which expressly provided that the resolution of eligibility issues therein should be final and binding". The effort is futile. On a form prescribed by the Board, the stipulation didactically spells out who may vote, requires them to be named individually and exacts prior verification of the list by the opposing parties. A declaration of eligibility more conclusive is scarely conceivable.

■ 2. The "erasure ballot" was rejected by the Board for ambiguity in its marking. We think it should have been polled as registering the balloter's intention to say "No".

The pertinent part of the finding of the Examiner as to this ballot is as follows:

> "Examination of the original ballot reflects that the *marking in the 'no' box is more distinct than the marking in the 'yes' box* and there is an *indication of a possible attempt at erasure of the marking in the 'yes' box*. The Board Agent conducting the election first ruled this ballot 'Void', and after some discussion with the parties of the possible attempt at erasure, changed his rulings and declared it to be a 'no' vote.

The Board Agent then challenged the ballot and recorded it as such in the Tally of Ballots.

"The undersigned has carefully examined the ballot in question and, in his opinion, the intent of the voter is not clear; accordingly, it is recommended that the challenge to this ballot be sustained and that it be declared a 'Void' ballot." (Accent added.)

This description is helpfully amplified in the Board's brief:

"The voter did not place a mark in either the 'yes' or the 'no' square but rather, made his marks outside the squares of the two boxes. An 'X' was placed just outside the 'yes' square and a more distinct 'X' was placed outside the 'no' square."

■ We are as advantageously positioned as was the Board to read this ballot. 4 Davis, Administrative Law, at 241. It is not a question of the weight of evidence; the substantial-evidence rule of testing the acceptability of a Board finding does not prevail. We may and must without any such restriction construe the ballot. Celanese Corporation v. NLRB, 291 F.2d 224, 226 (7 Cir. 1961), cert. den. 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 189. A strikingly similar situation in NLRB v. Whitinsville Spinning Ring Co., 199 F.2d 585, 589 (1 Cir. 1952) illustrates the courts' untrammeled discretion in construing such a ballot.

■ The erasure ballot has since been so covered with a strip of scotch tape as to obscure the markings. Specifically, the adhesive runs across the "No" and over the erasure of "Yes", including any tell-tale traces of erasure. Removal of the tape would probably further efface these clues. Whether the tape was applied before or after the Board's examination of the ballot is not clear. Thus we can never know its minute but significant features, so vital to its validity and to the election. This diminution in the record is enough to set aside the Board's decision of the outcome at the polls. S. D.

Warren Co. v. NLRB, 342 F.2d 814, 816 (1 Cir. 1965).

With Finkelstein's ballot unopened, the count is now tied, 89 to 89, which, as we noted in the first opinion, would mean that the union had lost for want of a majority. The count, however, cannot be final until Finkelstein's ballot is opened. Should Finkelstein's preference be anti-union, as is reasonably suspected, the defeat would be more pronounced, 90 to 89. If he voted pro, the union would win the count. However, rather than delay further final determination by awaiting the casting of Finkelstein's ballot, we pass to the propriety of the pre-election literature.

■ 3. Campaign literature distributed by the union on two occasions shortly before the election was so irrelevant and so highly inflammatory, employer Schapiro asserts, as to invalidate the election. We agree.

The union's appeal to the voters urged the employees to consider and act upon race as a factor in the election. In its brief the Board fairly and completely describes each incident and its background. Thus:

"On August 2, 1963, about 4 weeks before the election, the Union circulated a leaflet among the Company's employees, practically all of whom are Negroes (J.A. 57). The leaflet, entitled 'THEY CAN'T FIRE EVERYBODY', listed the names of several employees who had recently been discharged (J.A. 57, 62). It stated:

'IF YOU ARE GOING TO LET THIS SCARE YOU INTO GIVING UP, THEN YOU'VE LOST AND THE COMPANY HAS WON. REMEMBER THIS, THE PEOPLE AT CAMBRIDGE DIDN'T GET SCARED NOR DID THEY GIVE UP BECAUSE THEIR FRIENDS WERE ARRESTED. INSTEAD, THE DEMONSTRATIONS GREW BIGGER.

THIS IS THE POSITION THAT YOU MUST TAKE. SHOW THIS COMPANY THAT YOU'RE NOT GOING TO BACK UP. OVER THE YEARS, YOU HAVE BEEN HELD DOWN.—LET US HELP YOU TO GET UP.

NOTE: WE HAVE FILED AN UNFAIR LABOR PRACTICE AGAINST THE COMPANY FOR EACH AND EVERY PERSON THAT HAS BEEN DISCHARG-ED. STICK WITH THESE PEOPLE, - THEY - ARE - DE-PENDING ON YOU.' (Emphasis in original.)

"On August 23, a week before the election, the Union circulated another leaflet. This leaflet reproduced a newspaper article, under the headline 'Young Gives Top Priority to Negroes' Job Security,' which stated that Ernest D. Young, a Negro member of the Maryland House of Delegates, had criticized Negro leaders for demonstration for 'social' rights they wanted and overlooking 'the real Negro problem of unfair employment practices' (J.A. 57, 63). The leaflet contained the the following message:

READ THIS! And thank God that we have such a man in office. Delegate Ernest D. Young knows the importance of jobs. Right now we are trying to help you on your job. You can help by voting, —'YES' on Aug. 30."

The second leaflet was headed with a picture of the Negro Delegate mentioned in the circular. Advertence to "Cambridge" was an allusion to recent racial strife there.

This type of propaganda is deplorable. It cannot be ignored on the assumption that it had no effect upon the voters, most of whom are Negroes. Not long ago we set aside an election because of misrepresentations in campaign dodgers. NLRB v. Bonnie Enterprises, Inc., 341 F.2d 712 (4 Cir. 1965). Although quite different in nature, the instant throwaways equally offend the electoral process and likewise vitiate the result.

As the Board itself noted in Sewell Manufacturing Co., 138 NLRB 66, 71:

"What we have said indicates our belief *that appeals to racial prejudice on matters unrelated to the election issues or to the union's activities are not mere 'prattle' or puffing. They have no place in Board electoral campaigns.* They inject an element which is destructive of the very purpose of an election. They create conditions which make impossible a sober, informed exercise of the franchise. The Board does not intend to tolerate as 'electoral propaganda' appeals or arguments which can have no purpose except to inflame the racial feelings of voters in the election." (Accent added.)

We approve these standards. Equality of race in privilege or economic opportunity was not presently an issue. That a majority of the employees were Negroes did not make it so. For the union to call upon racial pride or prejudice in the contest could "have no purpose except to inflame the racial feelings of voters in the election". Besides their utter irrelevance, the leaflets appear to this court as highly inflammatory, especially the reference to the "Cambridge" incidents. The reliance upon race inhibited a "sober, informed exercise of the franchise" and was altogether out of place.

As our canvass of the Finkelstein and erasure ballots apparently leads to a majority against unionization, the designation of the union as the representative of Schapiro's employees cannot stand. The same result follows from our ruling on the campaign literature. Consequently, the employer was warranted in refusing to bargain with the union and the contrary finding and order of the National Labor Relations Board is without support.

Enforcement of order denied.