**SCHNEIDER MILLS, INC. and Jimmy and Josh, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 10754.

United States Court of Appeals Fourth Circuit.

Argued Oct. 3, 1967.

Decided Jan. 8, 1968.

Arthur McM. Erwin, Spartanburg, S. C., for petitioner.

Allison M. Brown, Jr., Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., on the brief) for respondent.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges.*

WINTER, Circuit Judge:

Schneider Mills, Inc. and Jimmy and Josh, Inc. (collectively called the "company"), which carry on a unitary business of manufacturing textiles and textile products, with principal offices and places of business at Taylorsville, North Carolina, petition to set aside the findings of the Board that the company violated §§ 8(a) (5) and 8(a) (1) of the Act by its conceded refusal to bargain with the Textile Workers Union of America, AFL-CIO (the "union").[1] The petition, and resistance to enforcement of the Board's order directing bargaining, are predicated upon the contention that the union was not certified as the representative of the company's production and maintenance employees *pursuant to a valid representation election.* We agree that the election was not valid, because of the union's improper election propaganda. We set aside the finding and refuse enforcement of the order.

The election, pursuant to which the union was certified, was held November 5, 1965, under the direction of the Regional Director for the Eleventh Regional Office of the Board. At the election, a majority of the employees voted in favor of representation by the union.[2] The company filed timely objections to the election, but the Regional Director, after investigation, concluded that the objections of the company were without merit and certified the union. When the company refused to bargain with the union, it was charged with an unfair labor practice, violative of §§ 8(a) (5) and 8(a) (1). At the hearing on the unfair labor practice charges, the company proffered what it intended to prove, but the trial examiner refused receipt of the formal proof and granted general counsel's motion for judgment on the pleadings, stating that no factual matters requiring the taking of testimony or receipt of other evidence were raised by the company. The Board adopted the trial examiner's decision without modification.

Specifically, the company's challenge to the validity of the representation election is predicated upon three union handbills, two of which were circulated on October 21 and November 2, respectively, and the third on the eve and day of the election, and upon the union-sponsored radio broadcasts on the eve of election which were repeated throughout the day of election. Our conclusion that the

---

* The case was heard initially on January 13, 1967 before a panel consisting of Sobeloff and Craven, Circuit Judges, and Kaufman, District Judge.

1. While the company's petition prays only that the order be set aside, the Board's answer prays enforcement of the order.

2. Of the approximately 404 employees eligible to vote in the election, 365 cast valid ballots. Of these ballots, 211 were cast in favor of representation by the union and 154 were cast against representation by the union. In addition to the 365 valid ballots, there were 14 ballots which were challenged—a number insufficient to affect the results of the election.

union's propaganda invalidated the election rests on the third handbill and the radio broadcasts; hence, we find it unnecessary to consider fully the other handbills.

In language undeniably offensive, the handbill of November 4–5 sought to impugn the character and motives of Mr. Schneider, the president of the company, in resisting unionization. The challenged portion of the handbill reads as follows:

"We have been told that he [Schneider] made the remark that he wished he could tie two of the women employees, who are active in the Union, to their machines and set them on fire and watch them burn to death. A person who talks like this is bound to be mentally disturbed and dangerous to be around. This type of filth is what a half million American boys gave their lives to prevent in World War II—to keep another mad man by the name of Hitler from destroying the world."

On the record before us, we must treat the alleged statement of Mr. Schneider as never made. At the unfair labor practice hearing, the company proffered to prove that Mr. Schneider did not make such a statement. It is true that the Regional Director in concluding to issue a Certificate of Representative noted that evidence was offered during the course of the investigation conducted by him which tended to show that a similar remark was in fact made by Mr. Schneider, and that representatives of the union were informed of it. The Regional Director found it unnecessary to determine whether or not such a statement was actually made, in view of his conclusion that name-calling and insulting or derogatory statements by one party about another during an election do not warrant setting aside the results of the election. The evidence to which he referred is not included in the record before us. Absent such evidence and in the light of the company's rejected proffer of proof to the contrary, we assume the facts of the matter in the light most favorable to the company and decide the question raised by the handbill on the basis that Mr. Schneider did *not* make such a statement.

The radio broadcasts undertook falsely to assert benefits purportedly gained as a result of a union-led strike by employees at the Collins & Aikman plant in Albemarle, North Carolina, some seventy miles from Taylorsville. Some of the assertions in the broadcasts were being made for the first time, but some of them were repetitious of what had been earlier claimed in the handbill of November 2. The Regional Director found that the November 2 handbill was distributed at a time when the company was able to controvert the false statements contained therein and that, in fact, they had been controverted by the company in a campaign flyer, entitled "FACT SHEET," on November 4, one day before the election. The statements contained in the radio broadcasts, their accuracy, and whether they had been previously asserted in the November 2 handbill, are as follows:

1. "Allowance of 15 minutes paid lunch period, 5 minutes for 'wash-up and clean-up' time."

"Allowance for no less than 15% 'rest time' for workers on all job assignments in the plant."

From these statements, broadcast seriatim, a listener would understand that the benefits described were being stated conjunctively. The Regional Director found that the paid lunch period was a part of the fatigue and personal time, so that the representation that two non-duplicating benefits had been obtained by the union was false. This part of the statements was in the handbill and was repeated in the broadcast. New in the broadcast was the representation that an additional 5 minutes was allowed for "wash-up" and "clean-up" time. In the light of the Regional Director's finding this representation was also false.

2. "Overtime * * * for the sixth day work and double time for Sunday work."

The Regional Director found that the Collins & Aikman contract did provide for double time for Sunday work, but only when Sunday was the seventh consecutive day worked. The statement is substantially a repetition of the misrepresentation contained in the November 2 handbill.

3. "Premiums on Insurance Benefits for employees will be paid by the company and provides * * * Hospital, Health and Surgical coverage, plus Sick Leave pay of $15.00 per week."

The Regional Director found that the provision for sick leave pay was applicable only after the seventh consecutive day of illness. This misrepresentation was a repetition of that contained in the earlier handbill.

4. "During the negotiation sessions both parties had agreed to adoption of the general wage increase ranging from 5 cents to 7 cents an hour, plus 8 weeks back wages."

The Regional Director found that the contract provided for a wage increase of from 5 to 10 cents per hour but that the increase had been unilaterally granted by the employer in August and the contract made it retroactive to June. This misrepresentation was substantially a restatement of that contained in the handbill.

5. "The strike was called by the employees and not by the Union. The Union fed, and paid all bills of the workers while they were on strike."

In the previous handbill the union had claimed that during the strike at the Collins & Aikman plant the union had paid *the* bills, as distinguished from *all* bills, of the strikers. In regard to the previous handbill, the Regional Director found that "[I]nvestigation discloses that the Petitioner [union] did in fact spend substantial sums in providing various strike benefits * * *." From this finding we infer that the broadcast statement was a misrepresentation, more clearly false than its predecessor.

■ Unquestionably, under the decided cases "the control of the election proceeding and the determination of the steps necessary to conduct that election fairly were matters that Congress entrusted to the Board alone." National Labor Relations Board v. Waterman S.S. Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 503, 84 L.Ed. 704 (1940). Elsewhere stated, "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." National Labor Relations Board v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946).

■ The decisions of this Court are fully in accord with the quoted statements of the Supreme Court. We said recently in Overnite Transportation Company v. National Labor Relations Board, 327 F.2d 36, 41 (4 Cir. 1963), "The key factor in setting aside an election, whether by virtue of the conduct of the parties or of the Board, is the failure of those in the bargaining unit to make their collective desire effective." And this statement must be read in the context of our earlier pronouncement that "Whether a representation election has been conducted under conditions compatible with the exercise of a free choice by the employees, is a matter which Congress has committed to the discretion of the Board." National Labor Relations Board v. Shirlington Supermarket, Inc., 224 F.2d 649, 651 (4 Cir. 1955). See also, National Labor Relations Board v. National Plastic Products Co., 175 F.2d 755 (4 Cir. 1949). Only if it is found that the Board abused its discretion in the promulgation or application of such standards will the Courts overrule the Board's determination regarding the validity of a representation election. National Labor Relations Board v. Shirlington Supermarket, Inc., supra; National Labor Relations Board v. National Plastic Products Co., supra.[3]

3. In Celanese Corporation of America v. National Labor Relations Board, 279 F.

2d 204 (7 Cir. 1960,) cert. granted and remanded, 365 U.S. 297, 81 S.Ct. 689, 5

Reference need be made to only two of the Board's decisions establishing its basic policy and its general standards respecting the rights of employees to a free and unrestrained choice in representation elections. In Liberal Market, Inc., 108 N.L.R.B. 1481, 1482 (1954), the Board stated:

"In deciding whether the registration of a free choice is shown to have been unlikely, the Board must recognize that Board elections do not occur in a laboratory where controlled or artificial conditions may be established. We seek to establish ideal conditions insofar as possible, but we appraise the actual facts in the light of realistic standards of human conduct. It follows that elections must be appraised realistically and practically, and should not be judged against theoretically ideal, but nevertheless artificial, standards. * * * Basically, we feel that the results of a secret ballot, conducted under Government sponsorship and with all the safeguards which have been developed throughout the years, should not be lightly set aside. Like any other contest in which the stakes are high, the losing party is likely to protest the result, but this Board cannot be influenced by any subjective considerations."

The leading decision of the Board setting forth the standard for determining the validity of an election is Hollywood Ceramics Co., Inc., 140 N.L.R.B. 221, 224 (1962), where the Board said:

"We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election."

L.Ed.2d 688 (1961), on remand 291 F.2d 224 (7 Cir. 1961), cert. den., 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 189 (1961), a distinction is aparently made between the scope of judicial review over the

See also, Walgreen Co., 140 N.L.R.B. 1141 (1963); The Cleveland Trencher Company, 130 N.L.R.B. 600 (1961); Thomas Gouzoule, et al., d/b/a The Calidyne Company, 117 N.L.R.B. 1026 (1957); Reiss Associates, Inc., 116 N.L.R.B. 217 (1956); The Gummed Products Company, 112 N.L.R.B. 1092 (1955).

With full respect to the discretion vested in the Board, not only to establish standards for the conduct of a valid representation election but also to determine if those standards have been met, we can only conclude that the Board abused its discretion in holding that the election in the case at bar met its tests.

First as to the November 4–5 handbill, we recognize that, in political elections, exaggerations, hyperbole and appeals to the emotions are the stuff of which election campaigns are made. "Laboratory conditions" rarely prevail. And even if we were to conclude that in political elections, democracy has taken a backward step in its acceptance of these departures from the truth and that in representation elections an analogous regression should not be tolerated, our limited scope of review would prevent such a decision. The false statements in the November 4–5 handbill, however, exceed by far permissible standards in political elections, no matter how lax.

The statement falsely attributed to Schneider that he would like to see two tied workers incinerated depicts in him such a degree of inhumanity that employees not otherwise disposed to support the union could well conclude that a union would be their only source of protection, thus interfering substantially with their free and untrammeled choice. But the statement went further. It compared Schneider to Hitler, and thereby interjected into the election one of the most sordid episodes of modern history, with all of its overtones of religious persecution. Even though only a single instance,

Board's wide discretion in promulgating standards for free and fair elections and the scope of judicial review in the application of these standards. Our decisions do not recognize the distinction.

for employees in general, and in particular any employee having any identity with any group persecuted or partially annihilated under the Hitler regime, such propaganda was of a highly inflammatory nature and was manifestly not germane to the issues at stake in the election. That inflammatory statements which "create conditions which make impossible a sober, informed exercise of the franchise" and which are also both not truthful and not germane to the issues before the employees invalidate elections, has been recognized by the Board and approved by this Court. Sewell Manufacturing Co., 138 N.L.R.B. 66, 71–72 (1962); National Labor Relations Board v. Schapiro & Whitehouse, Inc., 356 F.2d 675, 679 (4 Cir. 1966). We think the statements in the November 4–5 handbill are of this nature.

■■ The misrepresentations in the November 4–5 broadcasts dealt with fringe benefits, and with one of the economic consequences of resort to a strike. These were matters of vital concern to employees voting in the election. The Cleveland Trencher Company, supra, at 603; Coca Cola Bottling Company of Louisville, 150 N.L.R.B. 397, 400 (1964).[4] Union misrepresentations concerning wage rates and fringe benefits purportedly obtained by a union for other employees may be of such a substantial nature as to be expected to have a significant impact on an election. Cleveland Trencher Co., supra; Kawneer Co., 119 N.L.R.B. 1460 (1958); Reiss Associates, Inc., supra; The Gummed Products Company, supra. The substantiality of the misrepresentations is not contested by the Board; it defends on the grounds that the company answered the statements contained in the November 2 hand-

bill, and that the broadcasts were merely repetitious of the former.

We reject the defense for several reasons. What was said in the broadcasts was not only repetitive of the statements in the November 2 handbill. One of the statements was a misrepresentation that had not been made before, and another was a prior misrepresentation enlarged upon. To the extent that the new and the enlarged misrepresentations were made, the company had no opportunity to make an effective reply. Hollywood Ceramics Co., Inc., supra. To the extent that previously made misrepresentations were repeated, we think that their vitiating effect on the validity of the election can be obviated only if the company had a second opportunity to make an effective reply, whether the company availed itself of the opportunity or not. It is clear in this case that the company had no such opportunity. Such a rule, we think, was prescribed by the Board in The Gummed Products Company, supra, at 1094, and the Board abused its discretion by not applying it in this case.

Enforcement denied.

SOBELOFF and CRAVEN, Circuit Judges (dissenting):

Our brethren, we think, overestimate the effect of the intemperate characterization of the employer made by employees in the election campaign.

If courts were to fix a criterion compelling the Board to set aside every union election in which there has been invective and vituperation, they would be establishing a loftier standard than has ever been demanded in any political election, and hardly any representation election would pass muster. However

---

4. In dealing with the broadcasts, we are met at the outset with the Board's contention that the company seeks to create a new ground for objecting to the election because it did not assert the invalidity of the election on this ground in the proceedings before the Regional Director or the Board. The company asserts, and the Board does not deny, that the text of the broadcasts was before the Re-

gional Director in his investigation of the election. The record shows that the company relied on the falsity of the broadcasts in its exceptions to the Board concerning the Regional Director's decision, proffered proof to the trial examiner in the unfair labor practice hearing and excepted to the trial examiner's decision, inter alia, on this ground. We consider the point preserved for review.

distasteful and unjust the statement may have been, nothing that was said about the employer exceeds in intensity what in our democracy has been heard in this generation and throughout our history about presidents, governors, congressmen and other officials. Voters must be trusted to exercise a wholesome selectivity in appraising the militant and sometimes overdrawn rhetoric in employer-union contests as in civic electioneering, where hard words are a commonplace.

It would be a rare case in which employees would be really swayed or misled when a union organizer calls the boss a tyrant or a Hitler or when an employer calls the union organizer an agitator or a communist. There is no ground in the present instance for thinking that this type of invective intimidated, nor is there any evidence of threats, express or implied. The offending statement must be judged by its probable impact on the electorate, and it was within the province of the Board to assess the influence, if any, of the union's statement within the totality of circumstances surrounding the election. Its expertise ought not to be supplanted by the court's speculation, and we should not open the door to endless post-election inquiries which threaten to impair the election process more seriously than the characterizations complained of.

Nor should the Board's determination of the effect of the alleged misrepresentations of economic facts be overturned. Such misstatements made without adequate opportunity for reply may in some instances affect the result sufficiently to vitiate an election. However, the misstatements charged in this case do not meet this measure, as District Judge Kaufman demonstrates in the able and thorough opinion prepared by him as a designated member of the original panel of this court.

Without attempting to restate the evidence or elaborate the reasons for our conclusions, we adopt Judge Kaufman's

1. 29 U.S.C.A. §§ 151–167.

opinion and reproduce it as an appendix to this dissent.

### APPENDIX
### UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT
No. 10,754.

Schneider Mills, Inc. and Jimmy and Josh, Inc., Petitioner,

*versus*

National Labor Relations Board, Respondent.

ON PETITION FOR REVIEW AND CROSS-PETITION TO ENFORCE AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD.

(Argued January 13, 1967. Decided ————.)

Before SOBELOFF and CRAVEN, Circuit Judges, and KAUFMAN, District Judge.

Arthur McM. Erwin for Petitioner.

Allison W. Brown, Jr., Attorney, National Labor Relations Board, for Respondent.

KAUFMAN, District Judge:

Petitioner, Schneider Mills, Inc. and Jimmy and Josh, Inc. (the Company), seeks to set aside an order of the National Labor Relations Board ordering the Company to bargain with the Textile Workers Union of America, AFL-CIO (the Union). The case presents questions concerning the permissible bounds of election propaganda under the National Labor Relations Act.[1] The Board found the Company guilty of unfair labor practices[2] based upon a finding that it refused to bargain with the Union. The Company, which maintains and operates a textile factory at Taylorsville, North Carolina, admits the refusal to bargain but denies that the Union was certified as the representative of its production and maintenance

2. NLRA §§ 8(a) (1) and (5), 29 U.S.C.A. §§ 158(a) (1) and (5).

employees pursuant to a valid representation election.

A representation election was held among these employees on November 5, 1965, under the direction of the Regional Director for the Eleventh Regional Office of the Board. At this election a majority of the employees voted in favor of representation by the Union.[3] The Company filed timely objections to the election. The Regional Director, after investigation, concluded that the objections of the Company were without merit and certified the Union. Upon application by the Company the Board refused to review or set aside the action of the Regional Director. Thereafter, the Company refused to bargain with the Union, and the Board's General Counsel instituted unfair labor practice charges against the Company. At the hearing in the unfair labor practice proceeding, after the Company proffered what it intended to prove, the Trial Examiner granted the General Counsel's motion for judgment on the pleadings, stating that no factual matters requiring the taking of testimony or evidence were raised by the Company. The Board affirmed the decision of its Trial Examiner and ordered the Company to bargain with the Union. The Company has petitioned this Court to set aside the Board's order on the ground that during the campaign which preceded the representation election the Union "made representations and engaged in campaign trickery which involved a substantial departure from the truth at a time when the Employer was unable to make an effective reply."[4] Specifically, the Company challenges the validity of the representation election because of three Union handbills and because of Union-sponsored radio broadcasts during the election campaign. The Company contends, in effect, that these items of campaign propaganda were of such a nature as to interfere with the free and unrestrained choice of the employees and that therefore the results of the election and what otherwise must be taken to be the collective desire of a majority of employees in the bargaining unit should be set aside.[5] A decision of the employees is not free and unrestrained unless it is untainted by coercion. Nor is there a choice unless the "employees have access to relevant information, that they use this data to determine the possible consequences of selecting or rejecting the union, and that they appraise these possibilities in light of their own values and desires to determine whether a vote for the union promises to promote or impair their interests."[6] Where it is clear that such free and unrestrained choice in a representation election has been interfered with, the Board and, if necessary, the Courts should not hesitate to set that election aside. In most cases, however, it is exceedingly difficult to

---

3. Of the approximately 404 employees eligible to vote in the election, 365 cast valid ballots. Of these ballots, 211 were cast in favor of representation by the Union and 154 were cast against the Union. In addition to the 365 valid ballots, there were 14 ballots which were challenged—a number insufficient to affect the results of the election.

4. This is the third of three objections which the Company filed with the Regional Director. The first and second objections related to questions concerning the eligibility of certain employees to vote in the election. The Regional Director and the Trial Examiner ruled adversely to the Company with regard to all three objections. Since the Company has not referred to the first and second objections, either in its petition for review by this Court or in its brief or during oral argument in these proceedings, we hold that the Company has abandoned those objections and will not further consider them in connection with this proceeding.

5. Overnite Transportation Company v. N.L.R.B., 327 F.2d 36, 41 (4th Cir. 1963) ("The key factor in setting aside an election, whether by virtue of the conduct of the parties or of the Board, is the failure of those in the bargaining unit to make their collective desire effective."); Hollywood Ceramics Co., 140 N.L.R.B. 221, 223–224 (1962).

6. D. Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 HARV.L.REV. 38, 46 (1964).

determine whether campaign propaganda has had that proscribed effect. For this reason the task of establishing and enforcing standards to safeguard the free ballot in representation elections is one which lies initially with the Board, a body which "Congress has entrusted * * * with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." N.L.R.B. v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946). "Whether a representation election has been conducted under conditions compatible with the exercise of a free choice by the employees, is a matter which Congress has committed to the discretion of the Board." N.L.R.B. v. Shirlington Supermarket, Inc., 224 F.2d 649, 651 (4th Cir. 1955). Only if it is found that the Board has abused its wide discretion in the promulgation or application of such standards will the Courts overrule the Board's determination regarding the validity of a representation election. N.L.R.B. v. Jesse Jones Sausage Co., 309 F.2d 664 (4th Cir. 1962); N.L.R.B. v. Shirlington Supermarket, Inc., supra, 224 F.2d at 652–653; N.L.R.B. v. National Plastic Products Co., 175 F.2d 755, 758 (4th Cir. 1949).[7]

In establishing standards to safeguard the right of employees to a free and unrestrained choice in representation elections the Board has given due recognition to the fact that elections of any kind, if truly free, are not the easy subjects of close regulation. As was stated in Liberal Market, Inc., 108 N.L.R.B. 1481, 1482 (1954):

> In deciding whether the registration of a free choice is shown to have been unlikely, the Board must recognize that Board elections do not occur in a laboratory where controlled or artificial conditions may be established. We seek to establish ideal conditions insofar as possible, but we appraise the actual facts in the light of realistic standards of human conduct. It follows that elections must be appraised realistically and practically, and should not be judged against theoretically ideal, but nevertheless artificial, standards. * * * Basically, we feel that the results of a secret ballot, conducted under Government sponsorship and with all the safeguards which have been developed throughout the years, should not be lightly set aside. Like any other contest in which the stakes are high, the losing party is likely to protest the result, but this Board cannot be influenced by any subjective considerations.

The standard most often alluded to by the Board is set forth in Hollywood Ceramics Co., 140 N.L.R.B. 221, 224 (1962), in which the Board stated:

> We believe that an election should be set aside only where there has been a misrepresentation or other substantial campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effec-

---

7. In determining whether or not the Board has abused its discretion, the Court's inquiry is directed to the question of whether the Board's findings are supported by substantial evidence. As was said in Celanese Corp. of America v. N.L.R.B., 291 F.2d 224 (7th Cir. 1961):

> There is no conflict or contradiction between the substantial evidence rule determinative of the scope of review and the principle whereunder the Board is entrusted with wide discretion in establishing the procedures and safeguards necessary to insure the fair and free choice of bargaining representatives as enunciated in National Labor Relations Board v. A. J. Tower Co. * * *. These rules do not conflict because they affect differing spheres of activity. The Board's wide discretion lies in the initial promulgation of rules and regulations, while the court exercises its duties in reviewing decisions involving application of the Board's rules. Judicial review in these cases is not concerned with the wisdom of the Board's policy but must determine whether the record as a whole supports the findings and conclusions respecting compliance with the policies, rules, and regulations promulgated by the Board. [291 F.2d at 225].

tive reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election.

The question which is presently before this Court for decision is whether, under these legal standards, the Board reasonably exercised its discretion in refusing to set aside the representation election of November 5, 1965. We answer that question in the affirmative and direct that the order of the Board in this case be enforced. In so doing, we find that the Company did not proffer at the unfair labor practice proceeding evidence of any substantial and material factual issue which required the Trial Examiner to take testimony. See N. L. R. B. v. Atkinson Dredging Co., 329 F.2d 158, 164 (4th Cir.1964); compare N. L. R. B. v. Lord Baltimore Press, Inc., 300 F.2d 671 (4th Cir.1962). In so doing, we also find it appropriate to discuss separately each of the challenged items of campaign propaganda.

*One.* In a mimeographed throwaway handbill (which is encaptioned "Poor Mr. Textile Boss!") distributed to the employees on October 21, 1965, the Union made certain statements concerning wage rates and other benefits purportedly enjoyed by unionized employees of northern textile manufacturers. The portion of the handout which the Company challenges reads as follows:

> Northern Textile Manufacturers whose employees belong to the TEXTILE WORKERS UNION OF AMERICA, AFL–CIO often pay as high as $3.50 an hour for winders, spinners, weavers, fixers, card tenders, inspectors and twisters. Workers often make as high as $148.00 a week, for 40 hours work.

The Company claims that this representation is false and misleading and that it concerns matters which were within the Union's special and exclusive knowledge. The Regional Director assumed without deciding that the statements objected to did misrepresent the wage and workload situation in northern textile plants, but found the Company's objection to be without merit on the ground that because the handbill was distributed more than two weeks prior to the election, the Company had ample time within which to reply.

We agree with the Regional Director. The handbill of October 21 was not, in relation to the election held on November 5, made at a time which would prevent the Company from making an effective reply. "[A]s the opportunity to reply is enhanced, the need for regulating the content of speech tends to diminish."[8] We cannot say that the Regional Director abused his discretion in determining that two weeks constituted a sufficient period of time within which to make an effective reply to a campaign circular of this character. The Company argues that no effective reply could have been made by it under the standards established in the *Hollywood Ceramics* case because the assertions made in the handbill were peculiarly within the knowledge of the Union, particularly since the northern textile mills referred to by the Union were not identified. But in determining whether or not there existed the opportunity to make an effective reply to a piece of campaign literature, the Board is not required to assume a party devoid of imagination or industry or the ability to assemble economic data and argument to make an effective reply.

*Two.* On November 2, 1965, three days before the election, the Union distributed a handbill which described benefits purportedly gained, as the result of a strike, by employees at the Collins & Aikman plant in Albemarle, North Carolina, some seventy miles from Taylorsville. The Company makes a number of separate objections to statements made by the Union in this handbill. The Regional Director made separate findings thereon with regard to each of these statements.

1. The handbill stated that the Collins & Aikman employees "now have a Union contract." The Regional Director found that although the contract between

---

8. D. Bok, *supra* at 91.

the Union and Collins & Aikman was not formally signed until November 15, thirteen days after the handbill was distributed, all of the provisions of that contract had been agreed to and initialled by the parties at the time the strike was settled on October 29. In its offer of proof before the Trial Examiner in the unfair labor practice hearing, the Company offered to prove nothing at variance with this finding by the Regional Director.

2. The handbill asserted that the contract gave the Collins & Aikman employees a wage increase of 5 to 7 cents an hour retroactive to June, 1965. The Regional Director found that the contract provided for a wage increase of from 5 to 10 cents per hour but that the increase had been unilaterally granted by the employer in August and the contract made it retroactive to June. Again, at the hearing, the Company did not offer to prove anything contrary to the Regional Director's finding.

3. The handbill stated that the Collins contract called "for double time for all work performed on Sundays." The Regional Director found that the contract did provide for double time for Sunday work but only when Sunday was the seventh consecutive day worked. The Company at the hearing before the Trial Examiner offered to prove nothing to the contrary.

4. The Collins contract is described as providing for at least 15% rest time on all jobs and for a paid lunch period. The Regional Director found that while both statements were true, the lunch period was part of the rest time allowed and not additional time. The Company offered to prove that the rest time "included lunch period and a wash-up period and other time down on machines," but offered no other proof concerning the falsity of the statement.

5. The handbill stated that the Collins contract provided for $15.00 a week sick leave pay. The Regional Director found that this provision applied only after the seventh consecutive day of illness. The Company did not offer to prove that the statement was false in any other respect.

6. The handbill claimed that the average rate of pay at Collins & Aikman "is now around $2.00 per hour." The Regional Director found that the wage scale at Collins & Aikman ran from $1.44 to $2.25 per hour and that the unweighted average for all employee classifications was $1.73 an hour. The Company offered to prove nothing to the contrary.

It is clear that misrepresentations such as those which are challenged by the Company in regard to the handbill of November 2 may require that an election be set aside. Union misrepresentations concerning wage rates and other benefits purportedly obtained by the Union for other employees may be of such a substantial nature as to be expected to have a significant impact on the election. Cleveland Trencher Co., 130 N.L.R.B. 600 (1961); Kawneer Co., 119 N.L.R.B. 1460 (1958); Reiss Associates, Inc., 116 N.L.R.B. 217 (1956); Gummed Products Co., 112 N.L.R.B. 1092 (1955); D. Bok, supra at 90–91. In the present case, however, the Regional Director concluded that while certain of the statements complained of in the November 2 handbill did misrepresent or exaggerate the true facts of the Collins contract, the Company in fact made an effective reply to the Union's misrepresentations.

On November 4, two days after the distribution of the Union handbill and one day before the election, the Company issued a campaign flyer headed "FACT SHEET." This flyer purported to present "the true facts about the Collins and Aikman strike and how the top Union Officials of the TWUA Union sold the local Union members at Albemarle out at secret or unannounced meetings—at which the local Union representatives were not present." In connection with the settlement at Collins & Aikman, the flyer proclaimed in banners:

NO WAGE INCREASE

NO INCREASE IN FRINGE BENE-
FITS

NO ARBITRATION PROVISION

NO CHECK-OFF

Attached to the flyer was what purported to be a three-page news release from the management of Collins & Aikman which, if accurate, completely supported the banner assertions on the Company's flyer and, in view of its source, lent an authenticity to the Company's version of the Collins & Aikman dispute. As the Regional Director stated:

> The thrust of Petitioner's [the Union's] statement is that it had been able to do and had done much for the C & A employees. The thrust of the Employer's [the Company's] reply is that the Petitioner had done nothing for them, but rather had sold them out.

We agree with the Regional Director that under the circumstances the Company not only had ample opportunity within which to make an effective reply to the Union's misrepresentations but that such a reply was in fact made by the Company.

*Three.* The most serious issue which the Company raises in regard to the Union's campaign publicity arises in connection with a statement contained in a Union handout distributed on the day of the election, November 5. This undeniably offensive handbill seeks to impugn the character and motives of Mr. Schneider, the President of the Company. The challenged portion of the handbill reads as follows:

> We have been told he [Schneider] made the remark that he wished he could tie two of the women employees, who are active in the Union, to their machines and set them on fire and watch them burn to death. A person who talks like this is bound to be mentally disturbed and dangerous to be around. This type of filth is what a half million American boys gave their lives to prevent in World War II—to keep another mad man by the name of Hitler from destroying the world.

The Regional Director noted that evidence was presented during the course of the investigation conducted by him which tended to show that a substantially similar remark was in fact made by Mr. Schneider and that representatives of the Union were informed of it. The Regional Director, however, felt that it was unnecessary for him to determine whether or not such a statement was actually made by Mr. Schneider in view of his conclusion that name-calling and insulting or derogatory statements by one party about another during an election do not warrant setting aside the results of the election. In view of the fact that at the unfair labor practice hearing counsel for the Company offered to prove that Mr. Schneider did not make such a statement, an offer which the Trial Examiner rejected, we must assume the facts of the matter in the light most favorable to the Company and decide the questions raised by the handbill of November 5 on the basis that Mr. Schneider did not make such a statement. Upon this assumption we conclude that however reprehensible such compaign propaganda may be, the Board did not abuse its discretion in refusing to set aside the election on the basis of this item of campaign propaganda.

As we have already noted, a representation election will be set aside only if it appears likely that the nature of campaign propaganda is such as might reasonably be expected to have interfered with the free and unrestrained choice of the employees. It is difficult enough to determine with any degree of assurance whether misrepresentations as to wages, fringe benefits and other economic data, which are decidedly relevant to the choice with which the employees are faced, have had that effect. Where, however, the specific challenged item of propaganda consists of a single inflammatory statement made by one party about the other, it is almost impossible to speculate with any degree of assurance concerning its effect upon that free and unrestrained choice which the law seeks for employees.

Speech in union organizational activity and representation elections has been held to be generally entitled to the free speech benefits of the First Amendment.[9]

---

9. Thomas v. Collins, 323 U.S. 516, 537–538, 65 S.Ct. 315, 89 L.Ed. 430 (1945);

N.L.R.B. v. Virginia Elec. & Power Co., 314 U.S. 469, 476–477, 62 S.Ct. 344, 86

It has been persuasively argued that a more reasoned judgment on the part of the employees will rarely, if ever, be promoted by restrictions upon inflammatory speech.[10] It has also been well said that "little virtue will be gained by compelling the parties to be good, nor is there any reason to suppose that Congress intended the representation election as a drill in proper behavior for its own sake." [11]

Nevertheless, inflammatory statements which "create conditions which make impossible a sober, informed exercise of the franchise" and which are also both not truthful and not germane to the issues legitimately before the employees have caused the Board to invalidate elections. Sewell Manufacturing Co., 138 N.L.R.B. 66, 71–72 (1962). Common sense suggests that employees may think less clearly and rationally, and that the results of an election may thereby be materially influenced, when they are exposed to propaganda of a highly inflammatory nature. Where such propaganda is, in addition, not germane to the issues at stake in the election and consists merely of an irrelevant appeal to the prejudices of the employees, it should be subjected to the most careful scrutiny. N. L. R. B. v. Schapiro & Whitehouse, Inc., 356 F.2d 675, 678–679 (4th Cir. 1966), in which campaign literature distributed shortly before the election was held so irrelevant and so highly inflammatory as to require the invalidation of the election. Thus, the danger which highly inflammatory and irrelevant propaganda poses to the electoral process may be found to outweigh the danger posed by the imposition of restrictions upon the content of campaign statements.

We in no way condone the statement contained in the Union handbill of November 5. However, we do not find that the Board has abused its discretion in upholding the Regional Director's refusal to set aside the election here in issue on the basis of that statement. In Paula Shoe Co., 121 N.L.R.B. 673 (1958), a somewhat similar statement was involved, although the statement in that case was made sufficiently early in the pre-election campaign to enable rebuttal. In *Paula,* the employer objected to the following statement which was contained in a Union handbill: "If you want to avoid that the Jew Sandler continue to mistreat you, vote for UTM. * * *" The employer contended that the statement was designed to incite racial and religious prejudice against its plant manager and thus impaired a free choice by the employees in the election. The Board, in overruling the employer's objections to the election, stated:

> The report shows that this statement was the only reference to this issue made in the course of the preelection campaign. The Board has previously indicated that while it does not condone appeals to prejudice, the mere mention of a racial or religious issue is not grounds for setting aside an election. [121 N.L.R.B. at 676].

The Union's handbill of November 5 in the instant case is an attack upon Mr. Schneider's and the Company's purported lack of concern for the welfare of his employees. The challenged statement is one portion of that attack. As such, the statement is germane to the matters before the employees in the election and cannot be considered as an irrelevant appeal to prejudice. For that reason, particularly in the light of the Union's wide margin of victory in the election,[12] we hold that the Board did not exceed its discretionary authority in finding that this isolated statement did not constitute an interference with the free and unrestrained choice of the employees.

*Four.* On November 4 and 5—election eve and election day—the Union sponsored radio broadcasts, the challenged portions of which consisted almost en-

---

L.Ed. 348 (1941); Dal-Tex Optical Co., 137 N.L.R.B. 1782, 1787 n. 11 (1962).

10. D. Bok, supra at 67–74.

11. D. Bok, supra at 56.

12. See note 3, supra.

tirely of a repetition of the claims previously made in the Union's handbill of November 2 concerning the Collins & Aikman settlement. The Company in its brief refers to two portions of these broadcasts containing statements which have not already been considered by this Court in connection with the above discussion of the Union handbill of November 2: a claim that during the Collins & Aikman strike the Union had paid all the bills of the striking workers; and a statement that the Collins contract provided for five minutes "wash-up and clean-up" time.

The Board challenges the standing of the Company to raise in this Court any issue connected with these broadcasts, on the ground that such objection was not lodged by the Company with the Regional Director. See N. L. R. B. v. Rexall Chem. Co., 370 F.2d 363 (1st Cir.1967).

While we affirm the necessity of raising such timely objections with the Board, we need not here decide whether or not challenges to the radio broadcasts of November 4 and 5 were timely raised by the Company, as it appears clear that the portions of those broadcasts concerning which the Company complains were either repetitions of some of the matters contained in the Union handbill of November 2, or do not involve substantial departures from the truth.[13]

For the reasons stated, the order of the Board will be enforced.

13. The Union statement during the broadcasts that the Collins contract provided for five minutes "wash-up and clean-up" time, like the claim in the Union handbill of November 2 that the contract provided for 15% rest time on all job assignments, was effectively countered by the Company in its handbill of November 4. As for the claim in the radio broadcasts that the Union had paid the bills of the striking workers, that claim had been previously made by the Union in its November 2 handbill and was ruled upon by the Regional Director in the context of the timely objections which the Company filed to the matters contained in

that handbill. In his decision the Regional Director stated that "investigation discloses that the Petitioner [the Union] did in fact spend substantial sums in providing strike benefits for the C & A strikers." In view of this finding, which is not challenged by the Company, we do not find that the statement by the Union in the radio broadcasts that the Company paid *all* the bills of the workers while they were on strike involved a substantial departure from the truth, in the absence of a more specific offer by the Company of evidence to the contrary in the unfair labor practice proceeding before the Examiner.