833 F.2d 310
 126 L.R.R.M. (BNA) 3032
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
RIVER WALK MANOR, INC., Respondent.
 No. 86-3887.
 United States Court of Appeals, Fourth Circuit.
 Argued May 5, 1987.
Decided Oct. 26, 1987.
 
 Norman Buschsbaum (Douglas E. Koteen on brief) for respondent.
 Mark McCarty, National Labor Relations Board (Rosemary M. Collyer, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel, Peter Winkler, Supervisory Attorney, Patrick J. Szymanski, Victoria A. Higman on brief) for petitioner.
 Before SPROUSE and CHAPMAN, Circuit Judges, and JOHN MINOR WISDOM, United States Senior Circuit Judge for the Fifth Circuit, sitting by designation.
 CHAPMAN, Circuit Judge:
 
 
 1
 The National Labor Relations Board petitions for enforcement of its order requiring River Walk Manor, Inc., to engage in collective bargaining with District 1199E, National Union of Hospital Employees as the representative of service and maintenance employees at River Walk's Salisbury, Maryland, facility. The Board on a summary judgment motion determined that River Walk's refusal to bargain violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act. 29 U.S.C. Secs. 158(a)(1), (5). River Walk admits its refusal to bargain, but contends that the Board improperly certified the Union after the representation election. It argues, inter alia, that pro-union campaign activity by its supervisory charge nurses coerced employees into voting for the Union. We agree and deny enforcement of the Board's order.
 
 
 2
 * River Walk operates a nursing home in Salisbury, Maryland. During the winter and spring of 1983, the union worked to organize the employees of River Walk. To understand the level of supervisory activity by the charge nurses, a review of the facts related to the organizational process is necessary.
 
 
 3
 The union had five general membership meetings before filing its petition. The first of these meetings took place in late February 1983. No charge nurses attended this meeting, but at the second meeting, in mid-March, charge nurses LPNs Sonya Kiser, Katherine Robinson, Ethel Dashiell and Marsha Purnell attended with 20 other employees of River Walk Manor. Two union officials conducted this meeting and the employees voiced complaints about conditions at River Walk. Charge nurses Kiser and Purnell spoke at this meeting about their personal complaints and encouraged the River Walk employees in attendance to get together and establish the union at River Walk in order to secure better benefits.
 
 
 4
 The third meeting was held in early April and attended by 25 to 30 River Walk employees including charge nurses Kiser and Purnell. The meeting was again conducted by union officials and authorization cards were distributed to the River Walk employees. One of the union officials urged the River Walk employees to solicit signatures at work. Charge nurse Purnell told the employees at this meeting that they should join the union and that Purnell and Dashiell picked up cards at the meeting. Shortly before the petition was filed a meeting was held at the home of employee Angela Brinson and charge nurses Purnell and Ring were there. At this meeting, Purnell reported to the group on a union meeting which she had attended in Baltimore.
 
 
 5
 Between early March and the petition filing, charge nurse Kiser solicited support for the union from eligible voters at River Walk, sometimes as often as twice a day. She directed the majority of her pro-union solicitation to the group of nursing assistants whom she supervised. Kiser made her position and support of the union known to these employees and she urged them to join the union. Kiser signed a union authorization card before the petition was filed and she solicited union authorization cards from 5 other employees. Kiser asked employee Shirley Kelley to sign a union authorization card and Kelley replied that she wanted to go home and discuss it with her husband. Kiser told Kelley that it would be all right to talk with her husband, but she should not take the card home, because if it were misplaced, the card could fall into the wrong hands. Kiser also said that improvements and benefits could be obtained, if the employees organized and negotiated with River Walk. Kelley testified that Kiser concluded by telling her the card had to be signed right then, that tomorrow would be too late.
 
 
 6
 In a conversation with employee Leona Lock, Kiser asked Lock if she had any complaints about the facility. Lock said that she did and then described her complaints. Kiser asked if Lock believed that having a union would improve any of these problems and Kiser asked Lock to sign a union authorization card. Kiser also spoke with employee Beverly Smith about problems at the facility and asked if she were aware of the union campaign. When Smith indicated that she was familiar with the campaign, Kiser asked if she would be willing to sign an authorization card. Kiser also solicited authorization cards from charge nurses Sarah Hall and Beverly LeMer, and there was testimony that Kiser solicited signatures from employees Mary Curtis and Charlotte Phippin.
 
 
 7
 After the petition was filed, Kiser attended three general membership meetings. The first meeting in early May was conducted by a union official who discussed the union strategy in the upcoming campaign and what employees could expect from management of the nursing home. Kiser also attended a June meeting during the time that hearings were being conducted by the Board on the issue of whether charge nurses were supervisors. At this June meeting, union officials advised employees about the proceedings before the Board and Kiser expressed her concern that she may be a supervisor. Kiser attended a third post-petition meeting in July, a few days before the Board issued its Decision and Direction of Election. In addition to these general membership meetings, Kiser attended three union meetings which she characterized as "organizational meetings". According to Kiser these meetings were attended by a small core group of employees who were responsible for trying to establish the union at River Walk. Charge nurse Dashiell also attended one of these organizational meetings. In early June, Kiser conducted a meeting in her home, which was attended by five nursing assistants, whom she supervised, and one other eligible voter.
 
 
 8
 Charlotte Phippin testified that both Purnell and Kiser told employees "we all better stick together and vote yes for the union, because we will get better wages, better job security, and better benefits." Phippin testified that Purnell made this remark repeatedly and also testified that Kiser and Purnell told employees that if the union lost the election the employees would lose better wages, benefits, job security and might be laid off.
 
 
 9
 Shortly after the Board ruled that charge nurses were supervisors, representatives of the union and River Walk separately advised Kiser that she was a supervisor and that she must cease her union activities. Kiser called together the nursing assistants who worked under her supervision and whom she had been lobbying. She told them of the Board's determination and that her opinion about the union had not changed but that she could no longer be involved in the union. She urged the employees again to "stick together and do what you think is right." Kiser testified that after she was told she could no longer actively support the union, she confined her pro-union remarks to occasions when employees asked her if her opinion about the union had changed. Kiser stated that she replied each time that her opinion was unchanged. Employees Curtis and Phippin, however, testified that they heard Kiser make pro-union statements to employees several times a week, right up until election day. On election day, the union won the election fifty three to thirty with one ballot challenged.
 
 II
 
 10
 Although respondent has presented several issues in its objections to enforcement of the Board's order requiring it to engage in collective bargaining with District 1199E, National Union of Hospital Employees, we need only consider the claim that pro-union campaign activity by its supervisory charge nurses coerced employees into voting for the union.
 
 
 11
 We are aware that the burden is on the party objecting to an election to show that the challenged activity prejudiced the outcome. NLRB v. Bata Shoe Co., 377 F.2d 821, 826 (4th Cir.), cert. denied, 389 U.S. 917 (1967). A union election will not be set aside unless the conduct of one of the parties has prevented the employees from making their collective desires effective. Schneider Mills, Inc. v. NLRB, 390 F.2d 375, 378 (4th Cir.1968). The Board enjoys a wide degree of discretion in establishing the procedures and safeguards necessary to insure the fair and free choice of a bargaining representative for employees, and the determination should be set aside only when the Board has abused its discretion and its decision is not based upon substantial evidence.
 
 
 12
 In Turner's Express, Inc. v. NLRB, 456 F.2d 289 (4th Cir.1972) our circuit expressed its concern about extensive supervisory participation in union campaigns. We did not establish a per se rule invalidating an election if there was evidence of pro-union supervisory activity, but determined that such supervisory activity must be examined under the facts and circumstances of each case. The heart of the inquiry is whether such activity prevented the employees from freely exercising their right to vote and effectuating their collective choice. Employees' free choice is stifled and an election may be set aside if the supervisors' activities contained the seeds of potential reprisal, punishment, or intimidation. NLRB v. Manufacturers' Packaging Co., Inc., 645 F.2d 223, 226 (4th Cir.1981).
 
 
 13
 In the present case it is clear from the evidence that supervisory charge nurses were active in promoting the union, and that certain of these nurses, particularly Kiser focused her pro-union activities upon those employees whom she supervised. This is the threat to an open and free election condemned by our court in Turner's Express, Inc. v. NLRB.
 
 
 14
 The Board found that the activities of these charge nurses were harmless because of the company's vigorous anti-union campaign. We answered this rationalization in Turner's Express and also in NLRB v. Heck's, Inc., 386 F.2d 317, 322 (4th Cir.1967):
 
 
 15
 It is no answer that the company's anti-union position was abundantly known to the employees.... An employee properly could doubt his ability to obtain protection by appeals to higher company authority.
 
 
 16
 In industry an employee is more concerned about the attitude of his immediate supervisor than he is with the feelings of the company president. This is similar to the Army where a private is more concerned with the attitude of his corporal or sergeant than he is with the Colonel or General, since the corporal and sergeant control his day to day life.
 
 
 17
 Turner's Express at 292-293.
 
 
 18
 A switch of only 11 votes would have changed the result of this election and from the abundant evidence of pro-union supervisory activity, particularly directed at employees under the supervision of these activists, we cannot say
 
 
 19
 that the election was held in an atmosphere free not only from interference, restraint or coercion violative of the Act, but also from other elements which prevent or impede a reasoned choice.
 
 
 20
 ITT Lighting Fixtures v. NLRB, 658 F.2d 934, 936 (2nd Cir.1981).
 
 
 21
 There is no dispute that charge nurse Kiser was a supervisor, was aware of her position as a supervisor, and continued her pro-union activity with those whom she supervised until the date of the election. Kiser was a member of the "core" that sought a union. She presented union cards to five persons she supervised and had the cards signed in her presence and immediately returned to her. She did not stop campaigning for the union even after she was advised that she was a supervisor and must desist from such activity. Her actions in support of the union among her subordinates continued through the election. She sat at the union table during some of the hearings before the examiner. She testified that she could not recall being advised by union agents that her continued involvement in the election could cause the results to be set aside. In NLRB v. Metropolitan Life Insurance Company, 405 F.2d 1169 (2nd Cir.1968) certain supervisors were erroneously included in the bargaining unit. The court invalidated the election stating that since it was unknown to what extent, if any, these supervisors engaged in pro-union activities and perhaps influenced the voting pattern of other employees, the court could not be sure that the "laboratory conditions" necessary to a valid election had not been disturbed. Here we need not speculate as to whether the charge nurse supervisors engaged in pro-union activity. This is a given, and because of this activity, the election cannot be considered valid. For this reason we deny enforcement of the Board's order. We find no merit in the other issues presented.
 
 
 22
 PETITION DENIED.
 
 SPROUSE, Circuit Judge, dissenting:
 
 23
 I respectfully dissent. The majority concludes that a representation election held over four years ago at River Walk Manor, which the union won by a substantial majority of votes, must now be set aside because it is a "given" that charge-nurse supervisors engaged in pro-union activity during the election campaign. The Regional Director conducted an extensive evidentiary hearing on River Walk's "supervisory taint" objections, however, and the Board adopted his conclusion that the charge nurses' participation in the election process did not interfere with the employees' exercise of free choice at the ballot box. Because the Board correctly applied the law, and its decision rests on a substantial evidentiary basis, I would enforce its bargaining order.
 
 
 24
 As the Board found, the evidence of supervisory influence was only minimal. Four of the five charge nurses who took part in the early organizational process terminated their pro-union activities at least three months before the date of the election. Two of them (Purnell and Dashiell) resigned from their employment at River Walk. Two others (Robinson and Ring) did no more than attend organizational meetings prior to the filing of the election petition. The Board agreed that their activities in the incipient stages of the campaign had no effect on the outcome of the election. This finding is supported by substantial evidence.
 
 
 25
 It is true that Nurse Kiser continued to support the union after the election petition was filed. She sharply curtailed her activities, however, once it was determined that she was a supervisor and therefore ineligible to vote. In the month preceding the election, Kiser did no more than passively respond to the questions of five or six employees she supervised. She simply answered that her opinion of the union had not changed. Importantly, there was no evidence that Kiser, or for that matter, any other supervisor, threatened to retaliate against employees who did not favor the union. In contrast, River Walk distributed numerous notices to the employees, detailing its staunch opposition to the union.
 
 
 26
 It was, of course, River Walk's burden to prove not only that supervisors had participated in the election campaign, but also that their conduct "prevented employees from freely effectuating their collective choice." NLRB v. Manufacturer's Packaging Co., 645 F.2d 223, 226 (4th Cir.1981); Schneider Mills, Inc. v. NLRB, 390 F.2d 375, 378 (4th Cir.1968). Substantial evidence supports the Board's conclusion that River Walk did not satisfy this burden.